CHARLES G. BARNES AND HARRISON G. REYNOLDS, EXECUTORS, ESTATE OF PHILIP M. REYNOLDS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CHARLES G. BARNES AND HARRISON G. REYNOLDS, EXECUTORS, ESTATE OF MARY G. REYNOLDS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 8624, 8625.    Promulgated September 27, 1927.

1. The basis for determining the amount of exhaustion deductible from gross income in income-tax returns of estates of deceased persons during the period of administration or settlement of the estate is the value of the exhaustible property at the date of death.

2. Rights to receive royalties over a given term *held* to be exhaustible property.

3. Taxes paid at the source constitute credits against the total tax and the balance of the tax paid by an estate is the amount against which the allowance under section 1200(a) of the Revenue Act of 1924 should be calculated.

*W. Sidney Felton, Esq.*, for the petitioners.
*A. S. Lisenby, Esq.*, for the respondent.

These appeals are from the final determination of deficiencies in income tax against the respective estates in amounts and for periods as follows:

Estate of Philip M. Reynolds, Docket No. 8624, deficiency $1,551.80, for the period from February 16 to December 31, 1923.

Estate of Mary G. Reynolds, Docket No. 8625, deficiency $1,420.59, for the period from April 7 to December 31, 1923.

The deficiencies were determined and based (1) upon the disallowance of a deduction claimed on the return of the estate of Philip M. Reynolds of $19,541.09, and a deduction claimed on the return of the estate of Mary G. Reynolds of $16,520.55, both on account of alleged exhaustion on certain alleged interests in patents and royalty rights, and (2) upon the allowance of a 25 per cent reduction, under section 1200(a) of the Revenue Act of 1924, upon the balance of the tax in the case of each estate after the deduction of a credit for tax paid at the source. The cases were consolidated for hearing and decision.

### FINDINGS OF FACT.

1. On July 29, 1910, Robert W. Scott and Scott & Williams, Inc., a New Jersey corporation, by its treasurer, Philip M. Reynolds, entered into a contract whereby Scott assigned to the corporation certain patents and application for patents and agreed to assign any inventions later made or acquired relating to the knitting art, and the corporation agreed to pay Scott a stated retainer per annum and also to pay the salary of an assistant for Scott. The contract was revocable at the option of the corporation.

2. On March 10, 1913, Scott and the corporation, by its treasurer, Philip M. Reynolds, entered into a new agreement whereby Scott assigned to the corporation ten letters of application for patents covering certain inventions, together with the right to letters patent upon the said inventions in all foreign countries, and agreed to assign all future inventions made improving the said patents to be obtained upon the letters of application assigned therein and upon the patents assigned under the agreement of July 29, 1910, but reserving in Scott the right to all new inventions not merely improvements or perfections, and the corporation agreed to introduce the machines invented upon the market and pay to Scott monthly a royalty or a

patent fee at the rate of 10 per cent of the net price of each machine having any of Scott's inventions in whole or in part, or for making any of the products or practicing the processes claimed in his patents or applications for patents.   By the fifth article of the contract Scott agreed:

To free Scott & Williams, Inc., from the necessity of paying royalties after the expiration of the important patents involved, at which time keen competition might be set up by other builders of knitting machines, it is distinctly understood and agreed that, although some minor patents might be in force at the time, all payments of royalty to Scott, his legal representatives or assigns, shall cease and this agreement be terminated when U. S. Patents numbered 1,045,620 and 1,045,621 both dated November 26, 1912, and U. S. Patent or Patents resulting from application serial number 746,070, dated February 3, 1913, and U. S. Patent or Patents resulting from application now in course of preparation covering the invention of a machine for the making of out-turned welts, and U. S. Patents resulting from application covering hosiery and processes for making same, serial number 748,308, serial number 748,309, and serial number 748,310, all bearing date of February 14, 1913, have expired.

It is further understood that if the application for any claim or invention is finally refused by the Commissioner of Patents of the United States Patent Office, no royalty need be paid for the use in any machine sold of such invention or claim so rejected unless and until a patent is thereafter obtained through appeal to or through proceedings in Court, and that if any patent or claim therein is declared invalid by any United States Court of Appeals or any United States Court of final jurisdiction, no royalty need be paid for the use in any machine thereafter sold of any invention or claim so held invalid.

It was further provided that should the corporation default in the payment of royalties, or breach any other of the covenants of the contract, the title to the patents and inventions should revert to Scott upon 30 days written notice by him to that effect.

3. On May 15, 1913, Scott, for one dollar and other valuable considerations, assigned to Philip M. Reynolds, his heirs, executors and assigns, a one-half interest in and to all royalties and sums due or to become due to Scott under the agreement entered into between Scott and the corporation under date of March 10, 1913.

4. On April 2, 1917, Scott and Scott & Williams, Inc., a Massachusetts corporation, (successor to the New Jersey corporation of that name hereinbefore mentioned) entered into an agreement whereby the agreements of July 29, 1910, and March 10, 1913, were modified, and the title of the corporation confirmed in and to 42 letters patent dated from October 30, 1916, to February 20, 1917, and in and to 16 letters of application for patents dated from July 25, 1913, to September 11, 1916; Scott was obligated to assign to the corporation any inventions constituting improvements or perfections upon machines or inventions covered by letters patent or application for letters patent therein conveyed and confirmed; Scott

was confirmed in the right to repossess the patents and letters of application therefor conveyed upon default of the corporation in payment of royalties therein provided or for other breach, upon notice to the corporation. The sixth and seventh articles of this agreement read as follows:

SIXTH: The term of said agreement of March 10, 1913 is hereby extended until seventeen (17) years from July 4, 1919, [1916], the date when Letters Patent of the United States, No. 1,189,744 were issued upon Scott's invention, or if such patent shall be declared invalid, seventeen (17) years from the date of the next prior patent contained in said Schedule A. If, however, at the expiration of such period there are patents of Scott's which have been issued subsequent to July 4, 1916, which S. & W. Inc. desires to use in connection with machines manufactured by it, S. & W. Inc. shall have the option of extending the term of said agreement until the expiration of the last of such patents as it may desire to use, it being understood that it will notify Scott, or his heirs, executors, administrators or assigns, at least thirty (30) days prior to July 4, 1933, whether or not it desires to extend the term of said agreement and this modification thereof, and shall, at the expiration of the term of this agreement on such date, or as so extended, re-transfer to said Scott, his heirs, executors, administrators or assigns, said patents or applications for patents.

SEVENTH: The said agreement of March 10, 1913, is hereby confirmed in all respects, except as herein expressly modified.

5. On April 6, 1921, Philip M. Reynolds, by mesne conveyance, conveyed to his wife, Mary G. Reynolds, one-half of his one-half interest in the royalties due or to become due to him under the aforesaid instrument of March 10, 1913, as assigned by Scott to him on May 15, 1913.

6. Philip M. Reynolds died February 16, 1923, and Mary G. Reynolds died April 7, 1923.

7. On April 11, 1923, Scott and Scott & Williams, Inc., entered into an agreement whereby Scott assigned 2 patents and 13 letters of application for patents to the corporation for certain agreed royalties during the lifetime of the two patents or of the patents, if any, to be secured upon the letters of application conveyed. No mention was made in this agreement of any prior agreement and none of the terms of the prior agreements were incorporated therein.

8. Shortly after the death of Mary G. Reynolds the executors of the estates of Philip M. Reynolds and Mary G. Reynolds had a conversation with Robert F. Herrick, chairman of the board of directors of Scott & Williams, Inc., relative to a possible purchase by Herrick of the interests of the estates in the royalty contract. In the course of this conversation, Harrison G. Reynolds asked Herrick what he would pay for these interests if they were offered for sale, and Herrick replied that he would pay $450,000. These royalty interests were returned for purposes of Federal estate tax at $225,000 for each estate.

11340°—28——26

9. On May 4, 1923, Scott, as party of the first part, and the executors of the estates of Philip M. Reynolds and Mary G. Reynolds, as parties of the second part, entered into an agreement whereby each estate conveyed to Scott two-fifths of each estate's interest in the royalties due each estate under the agreements of March 10, 1913, and April 2, 1917, as the purchase price of 15 per cent interests for each estate in the royalty agreement between Scott and the corporation dated April 11, 1923.

10. On May 4, 1923, Charles R. Barnes and Harrison G. Reynolds, as executors of the estate of Philip M. Reynolds, and the corporation entered into an agreement whereby and in recital of the fact that " Whereas, by reason of certain assignments and transfers the said executors of Philip M. Reynolds, deceased, are now the owners of an undivided 15 per cent interest in and to the royalties payable under each of said agreements as aforesaid," which said agreements as stated were those two between Scott and the corporation dated March 10, 1913, and April 2, 1917, the corporation agreed to pay and the executors agreed to accept 15 per cent of the royalties payable by the corporation under the three agreements dated March 10, 1913, April 2, 1917, and April 11, 1923, between Scott and the corporation. On the same date the same parties executed a like agreement between the executors of the estate of Mary G. Reynolds and the corporation.

11. In adjusting the income-tax returns of the estates of Philip M. Reynolds and Mary G. Reynolds, for the periods February 16 to December 31, 1923, and April 7 to December 31, 1923, respectively, the Commissioner included in the gross income $40,058.48, representing income from royalties received by the estate of Philip M. Reynolds, and $34,563.91, representing income from royalties received by the estate of Mary G. Reynolds. The returns claimed as deductions from gross income for exhaustion of the value of the royalty rights $19,541.09 and $16,520.55, respectively. These deductions were disallowed by the Commissioner in determining the deficiencies herein involved.

12. In computing the 25 per cent reduction in income tax for 1923 for each estate, allowable under section 1200 of the Revenue Act of 1924, the Commissioner applied the 25 per cent reduction to the balance remaining after credit was allowed for tax paid at the source, amounting in the case of the estate of Philip M. Reynolds to $14.09, and in the case of the estate of Mary G. Reynolds $39.06.

OPINION.

SMITH: The petitioners, being the estates of Philip M. Reynolds and Mary G. Reynolds, claim the right to deduct from gross income of the estates for taxable portions of the calendar year 1923 amounts

for exhaustion of the contracts under which they received large amounts of royalties during the periods in question; they claim this right on the basis of the value of the contracts at the dates of death of the decedents, which is alleged to be at least $225,000 in each case.

The contentions of the petitioners are denied by the respondent, who contends (1) that the values of the royalty rights contended for by the petitioners are not supported by the evidence; (2) that the royalty rights are not exhaustible property, and (3) that if they are exhaustible property they should be exhausted upon the basis of the cost to the decedents, rather than upon the basis of their value at the dates of death of the decedents.

The pertinent sections of the Revenue Act of 1921 are as follows:

SEC. 219. (a) That the tax imposed by sections 210 and 211 shall apply to the income of estates or of any kind of property held in trust, including—

(1) Income received by estates of deceased persons during the period of administration or settlement of the estate;

*       *       *       *       *       *       *

(b) The fiduciary shall be responsible for making the return of income for the estate or trust for which he acts. The net income of the estate or trust shall be computed in the same manner and on the same basis as provided in section 212 * * *.

(c) In cases under paragraphs (1), (2), or (3) of subdivision (a) or in any other case within subdivision (a) of this section except paragraph (4) thereof the tax shall be imposed upon the net income of the estate or trust and shall be paid by the fiduciary * * * In such cases the estate or trust shall, for the purpose of the normal tax, be allowed the same credits as are allowed to single persons under section 216.

SEC. 212. (a) That in the case of an individual the term "net income" means the gross income as defined in section 213, less the deductions allowed by section 214. * * *

SEC. 213. That for the purposes of this title (except as otherwise provided in section 233) the term "gross income"—

*       *       *       *       *       *       *

(b) Does not include the following items, which shall be exempt from taxation under this title:

*       *       *       *       *       *       *

(3) The value of property acquired by gift, bequest, devise, or descent (but the income from such property shall be included in gross income); * * *

SEC. 214. (a) That in computing net income there shall be allowed as deductions:

*       *       *       *       *       *       *

(8) A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence. In the case of such property acquired before March 1, 1913, this deduction shall be computed upon the basis of its fair market price or value as of March 1, 1913 * * *

The evidence as to the value of the royalty rights at the dates of death of the decedents consists principally of a conversation between

one of the executors of the decedents' estates and the chairman of the board of directors of Scott & Williams, Inc., in which the chairman signified a willingness to pay $450,000 for the rights of the estates to receive royalties if they should wish to sell them; of the fact that the royalty rights were reported in estate-tax returns of the estates of each of the decedents at a value of $225,000; and of the amount of royalties received by the estate of each decedent for a fractional part of the year 1923. The amounts of royalties received for the fractional parts of the year 1923 for which income-tax returns were made for the estates would indicate that the royalty receipts for the full year would amount to nearly $50,000 in the case of each estate. This evidence satisfies us that the value of the rights to receive royalties possessed by the estate of Philip M. Reynolds at the date of death of the decedent was equal to $225,000, and that of the estate of Mary G. Reynolds the same amount less the exhaustion sustained from February 16, 1923, to the date of her death, April 7, 1923.

The respondent contends that the contracts to receive royalties were not property upon which a deduction for exhaustion can be predicated; that neither of the petitioners had any enforceable right against Scott & Williams, Inc., for royalties prior to the contract between the executors and the corporation dated May 4, 1923; that the evidence does not show that Philip M. Reynolds had any right to royalties payable under the agreement between Scott and the corporation dated April 2, 1917, modifying and extending the contract of March 10, 1913. The assignment by Robert W. Scott to Philip M. Reynolds of one-half interest in the contract of March 10, 1913, carried with it, in our opinion, a right to receive one-half of the royalties payable to Scott. The modification and extension of the contract between Scott and the corporation did not operate to bar Reynolds from his interest in the contract. All of the parties interested recognized the fact that Reynolds was still entitled to receive his royalties and he did receive them. In the light of this situation we are of the opinion that the objections of the respondent upon this point are without merit.

We have held in *Appeal of Julia Andrews Bruce*, et al., 5 B. T. A. 300, that a contract right to receive royalties is a depreciable asset. In *Atlantic Carton Corporation*, 2 B. T. A. 380, the question under consideration was whether certain contracts assigned to a corporation were merely subscriptions to its capital stock or were assets. In the course of its opinion the Board said:

Taking the most favorable view of the situation for the taxpayer, the contracts and options turned over to the corporation by Turner and Van Wagenen under the contract of November 23, 1916, were property and their cost was properly capital of the corporation. Therefore, the taxpayer was entitled to take deductions for the exhaustion of that property in the same manner

as in the case of any other exhaustible property; that is, to spread such exhaustion over the life of the property and deduct an aliquot part in each year of its life.

To the same effect is *General Equipment Co.*, 2 B. T. A. 804, in which the Board said:

And this principle [of depreciation] may be extended to contracts and other intangible property where their life is definitely limited.

See also *Kentucky Tobacco Products Co.* v. *Lucas*, 5 Fed. (2d) 723, in which it was held that under the Revenue Act of 1918 a corporation was entitled to deduct from gross income a reasonable amount for the exhaustion of a contract used in its business.

The taxing statute permits the deduction of a reasonable allowance for the exhaustion of property "*used in the trade or business.*" The income of the petitioner estates arose from royalty contracts. We think that they were "used" in the business of the estates within the meaning of the statute.

The period over which the estates were to receive royalty contracts is not entirely definite. They were clearly to receive them until July 4, 1933, and might receive them for a longer period. We think, however, from the record that there is no certainty that royalties will be received beyond July 4, 1933, and we accept that date as the end of the royalty term.

The third contention of the respondent upon this point is that if the petitioners are entitled to deduct any amount for exhaustion of their royalty contracts such exhaustion must be based upon the cost to the decedents and not upon their value at the dates of death. In support of this contention the respondent cites *McKinney* v. *United States*, 62 Ct. Cls. 180, 188. Petition for a writ of certiorari was denied by the United States Supreme Court October 25, 1926, 273 U. S. 716. In that case the Court of Claims considered whether the basis for determining gain or loss on the sale of property by an estate under the provisions of the Revenue Act of 1918 was the fair market value of the property at the date of the decedent's death, or the cost or March 1, 1913, value of the property in the hands of the decedent. The court decided that the basis for determining such gain or loss was the cost in the hands of the decedent, and not the fair market value at the date of the decedent's death. The following is the language of the court upon that point:

Defendant is also contending that the sale by the executors creates a different situation from that which would have existed had the sale been made by McKinney himself, and it in effect asks the court to consider as the cost of the property, not the purchase price, but the appraised value of it at the time of the testator's death, as though it had cost them that amount. Of course, there was no cost to the executors. They were the personal representatives of the decedent. The stock was the same stock as it had been in the hands of the decedent, and, as stated, had he lived and sold the stock

himself there would have been no question of taxable gain. The fact that they were executors did not alter the situation.

From this it is argued that since the basis for computing the gain or loss is the cost to the decedent, the basis for computing exhaustion of property is the cost to the decedent and not the value at the date of death.

In *Appeal of Dorothy Payne Whitney Straight, Executrix*, 7 B. T. A. 177, the Board held that the basis for determining the gain or loss resulting from the sale of property by an executor is the value of the property at the date of the decedent's death and not the cost to the decedent. In the appeals at bar we reach the conclusion that the rights to receive royalties in the case of each estate had a capital value at the date of death the values of which property rights are exhaustible over periods of years which will end July 4, 1933. A reasonable allowance for the exhaustion of such contracts is the aliquot part thereof allocable to the taxable periods under review.

The second point involves the question whether taxes paid at the source should be deducted from the total tax due shown on the income-tax returns of the estates before the computation of the 25 per cent reduction allowed by section 1200(a) of the Revenue Act of 1924. We are of the opinion that taxes paid at the source constitute credits against the total tax and that the balance of the tax payable by the estate in each case is the amount against which the allowance under section 1200(a) of the taxing statute should be calculated. This is consonant with our decision in *Appeal of John Moir, et al.*, 3 B. T. A. 21.

Reviewed ' the Board.

> *Judgments will be entered on 15 days' notice, under Rule 50.*