## MORGANITE BRUSH COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 26369.   Promulgated November 12, 1931.

*Benjamin Mahler, Esq.,* for the petitioner.
*Miles J. O'Connor, Esq.,* for the respondent.

778

OPINION.

GOODRICH: Respondent seeks to hold petitioner liable as transferee for a deficiency alleged to be due from the Morgan Crucible Company of America, a corporation with which petitioner was affiliated during the period here in issue and which, upon subsequent dissolution, transferred all its assets to petitioner, of a net value in excess of the deficiency asserted. The petition, as amended, charges that this action is erroneous on the following grounds: That petitioner is liable only as an original taxpayer, not as a transferee within the meaning of section 280 of the Revenue Act of 1926; that the assessment and collection of the deficiency asserted against the Crucible Company can not now be made against petitioner as original taxpayer because

barred by the statute of limitations; that the Crucible Company should be charged with tax only on that part of the consolidated income properly allocable to it, rather than to assert against it the entire deficiency on the consolidated income, as has been done.

It appears that when respondent asserted the liability against petitioner for payment of the taxes of the Crucible Company, the statute had run upon any deficiency which might be due from petitioner as original taxpayer. It was admitted by counsel that the statute had not run against the liability, if any, of petitioner as transferee of the assets of the Crucible Company to pay the taxes of that company. Petitioner takes the position that, since it filed one consolidated return with the Crucible Company, any liability on its part must be as a taxpayer and not as a transferee. We believe this position to be unsound. The law provides for a consolidated return of income by two or more affiliated corporations and the computation of the total tax upon the basis of the consolidated income, but it also provides for the allocation of the tax among the consolidated corporations. Each is a taxpayer and liable for its part of the total tax. But there is no reason why, if one of these affiliated corporations takes over all the assets of another, leaving nothing from which to pay taxes, the transferee should not be liable for the tax of the transferor. That tax was not one for which the transferee was liable as a taxpayer, but represents a liability for which it became responsible by reason of the transfer. See *Caughey-Jossman Co.*, 8 B. T. A. 201; *Great Bear Spring Co.*, 12 B. T. A. 383; *New York Talking Machine Co.*, 13 B. T. A. 154; *American Creosoting Co.*, 12 B. T. A. 247; and *Thompson Scenic Ry. Co.*, 21 B. T. A. 718.

We are therefore of the opinion that the liability now asserted is not barred from collection because of the expiration of the statute upon taxes which might originally have been due from the petitioner as a taxpayer, and that petitioner is liable as a transferee under section 280 of the Revenue Act of 1926 for that portion of the total tax properly allocable to the Crucible Company.

But petitioner also complains that, even if liable as a transferee for taxes properly assessed against the Crucible Company, it is not so liable for that portion of the deficiency representing tax on that part of the consolidated net income properly assignable to it and as to which the statute has run. Section 240 of the Revenue Act of 1918 provides for the apportionment of the tax among affiliated companies upon the basis of their net incomes in the absence of any agreement with respect thereto. Here there is no evidence as to the existence or nonexistence of any such agreement between these corporations. The returns filed contain no specific notice of such an agreement but, on the other hand, they are filed in the name of the

parent company (the Crucible Company) and might be assumed to indicate that the entire liability disclosed thereby was undertaken by that company. Whether or not the specific notice of an agreement required by the Commissioner's regulations was filed, the record does not disclose. It is our opinion that the mere absence of proof of such an agreement can not be construed to mean that the agreement did not exist, and, consequently, that the tax liability of an affiliated group must be assessed against the members thereof on the basis of their respective net incomes, for we must treat as correct respondent's determination of petitioner's tax liability until petitioner, by positive evidence, has proved the same to be erroneous. The rule that the burden of proof is on petitioner is too well established to require citation or further discussion. The proof of the existence or nonexistence of an agreement between corporations as to the allocation of tax among them is, beyond doubt, a part of the taxpayer's burden. The facts concerning such an agreement lie in the taxpayer's hand and can be proved with ease. It may be that respondent, in allocating this tax liability upon a basis other than the net incomes of the affiliated corporations, had knowledge of some agreement between them. That we do not know, but we are bound to assume that his action was in accordance with the statute and that his determination of tax liability, and his allocation of the same, were correct, until the contrary is proved. We therefore sustain respondent in asserting the entire tax liability against the Crucible Company and hold petitioner liable therefor as the transferee of that company.

In its argument, petitioner strongly relies upon the decisions in *Phoenix National Bank et al.*, 14 B. T. A. 115, and *Essex Coal Co.* v. *Commissioner*, 39 Fed. (2d) 892. In the *Phoenix* case it was found as a fact that no agreement existed, and therefore the decision approved the allocation of tax liability as made by the Commissioner. The principle governing that decision is not in conflict with our conclusion here. We believe the decision in the *Essex* case is based strictly on the facts in that case and is not controlling of the case at bar. See *American Textile Woolen Co. et al.*, 23 B. T. A. 670. In passing, it should be noted that the records in *Cincinnati Mining Co.*, 8 B. T. A. 79; *Cleveland Trinidad Paving Co.*, 14 B. T. A. 1209; *Crystal Block Coal & Coke Co.*, 15 B. T. A. 600; *Aragon Mills*, 17 B. T. A. 257; *Angier Corporation*, 17 B. T. A. 1376, and other cases relied on by petitioner, disclose positively that there was no agreement between the various affiliated corporations as to the allocation of tax. See also *Popular Price Tailoring Co.* v. *Commissioner*, 33 Fed. (2d) 464; *Temtor Corn & Fruit Products Co.* v. *Commissioner*, 299 Fed. 326; *Woodside Cotton Mills Co.*, 13 B. T. A. 266; *American Textile Woolen Co.*, *supra*.

With respect to petitioner's claim for a deduction from income in the amount of $9,000 on account of notes ascertained to be worthless and charged off within the taxable period, it appears from the record that respondent has two conflicting theories regarding these notes. First, he claims that the loss should be disallowed because the notes never had a value; next he claims the loss should be disallowed because the notes were not determined to be worthless within the taxable period. The evidence does not justify either position. The evidence is that when Knott gave the three notes, he was apparently prosperous and not considered dishonest, and petitioner's officers had faith that he would make payment on them. To oppose this testimony respondent's counsel sought to show that the amount of Knott's property was unknown to the officers and that they were in no position to conclude that he was capable of making payment. But even if he had insufficient assets with which to meet these obligations when made, that fact is not sufficient reason for holding that the notes were then worthless and that their worthlessness could not be subsequently ascertained. As said in *W. Van E. Thompson*, 10 B. T. A. 1125:

A person may have credit to such an extent that he could borrow money upon his promissory note without having any other assets than his good name and character and yet circumstances may subsequently occur which would warrant the payee of the note in ascertaining that it was worthless and charging it off.

See also *Roy Nichols*, 17 B. T. A. 580. The notes were treated as collectible when given, and nothing occurred to destroy faith in their value until Knott's failure to meet the first, maturing in the taxable period. Such an event, followed by the attorney's inability to collect the judgment, the loss of Knott's new position and his removal from the country, constituted good reason to regard them all as worthless.

We have consistently held that an ascertainment of worthlessness is to be reached by the exercise of sound business judgment in the light of surrounding facts and circumstances which would lead a reasonably prudent business man to conclude the debt worthless. A remote hope of ultimate salvage is insufficient to defeat deduction (*John E. Saddler*, 2 B. T. A. 1305; *Howard McCutcheon*, 18 B. T. A. 834), for no taxpayer is required to be an incorrigible optimist. *United States* v. *White Dental Mfg. Co.*, 274 U. S. 398. To the same effect see *Selden* v. *Heiner*, 12 Fed. (2d) 474. Nor is the fact that two small collections were later made of controlling significance. *A. C. Kreipke*, 7 B. T. A. 777; affd., 32 Fed. (2d) 594; *American Warehouse Co.*, 19 B. T. A. 8; *Douglas County Light & Water Co.* v. *Commissioner*, 43 Fed. (2d) 904; and *Farish & Co.* v. *Commissioner*, 31 Fed. (2d) 79. The deduction of $9,000 on account of bad debts should be allowed.

Let us now consider petitioner's claim for relief under the provisions of sections 327 and 328 of the Revenue Act of 1918. The facts place this claim under subdivisions (a) and (c) of section 327, which read in part as follows:

(a) Where the Commissioner is unable to determine the invested capital as provided in section 326.

    *       *       *       *       *       *       *

(c) Where a mixed aggregate of tangible property and intangible property has been paid in for stock * * * and the Commissioner is unable satisfactorily to determine the respective value of the several classes of property at the time of payment, * * *

It was the intent of the London company to transfer to the Crucible Company all the assets, tangible or intangible (except the $100,000), which had belonged to its American branch. The Crucible Company actually took possession of these assets and, with petitioner, continued the American business. In addition to the physical assets mentioned in the list later compiled, the bill of sale expressly permits the free use of the London company's valuable patents, trade-marks and trade names, and authorizes the transfer of the lease on its New York premises. The list compiled for the purpose of valuation was not a part of the bill of sale, and does not limit the assets exchanged for stock to those specifically mentioned thereon. The good will, license to use patents and trade-marks, and the lease were equally a part of the consideration for which the Crucible Company's stock was issued, and should be included in a computation of its invested capital, or if their value is undeterminable, then special assessment should be granted under subdivisions (a) or (c). But a taxpayer should be held to a reasonable diligence in determining his invested capital, and only after a showing of such diligence and a resulting inability to establish it do the relief provisions apply. *Edwin M. Knowles China Co.*, 9 B. T. A. 1292; *Cramer & King*, 13 B. T. A. 399; (affd., 41 Fed. (2d) 24); *Cohn Goldwater Co.*, 15 B. T. A. 970; *Clemson Bros., Inc.*, 15 B. T. A. 1145.

Competent witnesses testified that, while they could not assign to the patents, good will, and trade-marks a specific monetary value, there was no doubt but that these assets had a very substantial value and their use contributed largely to the earnings. For instance, by use of the patent covering the insertion of the pigtail a saving of 42 cents a hundred on the manufacture of brushes was effected. From the evidence, the London company appears clearly to have been a leader in this specialized industry throughout the world, and to have spent considerable money in experiment and development, and in investigation of competitor's methods. It had developed superior combinations in the composition of its brushes and in the detail of cable contact with the machine. The adoption of this latter

method by competitors upon the expiration of the patent corroborates the witnesses' opinion that in 1920 the patent was very valuable. All these assets the Crucible Company, and through it the petitioner, acquired and used, and they were material factors in the production of its income.

The right given for the exclusive purchase in the country of the rough carbon blocks from the London company was also of substantial value, carrying as it did the benefits of the expensive technical experiments looking toward the improvement of the product, conducted by the London company both in laboratory and field, carrying also the benefits of reduced production costs resulting from use of the patent eliminating the kilning operation and the established superiority of the product, recognized by the electrical trade throughout the world. The London company's reputation for a superior brush was based upon the result of these experiments and activities, carried on over a long period. To duplicate this product a far greater working capital would have been required by the American companies than that with which they were equipped. There is good reason to agree with the witnesses that no specific value can be given the good will, trade-marks and patents. The business naturally resulting from the reputation of the London company for a superior product redounded to the benefit of the American companies and their sales in the United States. A mixed aggregate of this resulting good will, together with tangible assets of a value equal to the shares issued, was exchanged for the Crucible Company's capital stock. This situation is one contemplated by section 327 and, since the evidence establishes that these intangibles, the patents, good will and trade-marks did constitute material factors in the production of income, special assessment should be granted. *D. N. & E. Walter & Co.*, 4 B. T. A. 142; *Clarence Whitman & Sons, Inc.*, 11 B. T. A. 1192; *Rothschild Colortype Co.*, 14 B. T. A. 718; and *Farnsworth, Hoyt Co.*, 16 B. T. A. 309.

Having granted special assessment, it is unnecessary to consider the other issues relating to petitioner's invested capital.

We sustain respondent in disallowing as a deduction from income the sum of $3,591.20, representing the expense of organizing these domestic corporations. The rule that organization expenses are not deductible as ordinary and necessary business expenses is so well settled as to merit no further discussion or citation herein.

At the hearing petitioner's counsel orally amended his petition, complaining further that the Commissioner erred in not excluding from income of the consolidated group (1) the sum of $9,033.93 income shown applicable to the Morganite Brush Company; (2) in not excluding $1,795.60, one-half of the organization expenses

charged off by the Morganite Brush Company; and (3), in not excluding from income the sum of $12,833.33, representing the rent paid by the Morganite Brush Company to the Morgan Crucible Company in excess of the amount paid by the Morgan Crucible Company to outsiders.

The first two errors have already been covered. Respecting the third, petitioner is correct in its insistence that the $12,833.33 is merely an intercompany transaction, and intercompany transactions should be eliminated in the computation of consolidated net income. *Gulf Oil Corporation* v. *Lewellyn*, 248 U. S. 71; *Utica Knitting Co.* v. *United States*, 68 Ct. Cls. 77; certiorari denied, 281 U. S. 739. But while there is testimony to the effect that an intercompany charge and credit of this amount was made on the books, as would normally be done, there is no evidence that it was not properly reported in the return, nor do the deficiency notice and letters on which the computation of the deficiency is based show that respondent has failed to exclude the amount from taxable income. The allegations supporting this belated assignment are covered by a blanket denial, and as the burden of showing error in the respondent's acts rests on petitioner, it must here fail for lack of proof in substantiation of its allegations.

Reviewed by the Board.

*Judgment will be entered under Rule 62 (c).*