WASHBURN WIRE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 21710. Promulgated June 17, 1932.

*Albert R. Palmer, Esq.*, and *Harry W. Stelle, Esq.*, for the petitioner.

*Bruce A. Low, Esq.*, and *Francis S. Gettle, Esq.*, for the respondent.

OPINION.

ARUNDELL: Petitioner's claim for additional depreciation allowances is confined to machinery of the American Electrical Works on hand January 1, 1912. As to this item petitioner contends that, having taken but 76 per cent of the cost thereof prior to 1921—5 per cent in each of the years 1912 and 1913, 6 per cent in 1914, and 10 per cent each year thereafter to and including 1920—it is entitled to a rate of 10 per cent in 1921 and 1922 and the remaining 4 per cent in 1923, based upon cost of $652,245.21 at January 1, 1912. The respondent allowed depreciation at the rate of 10 per cent for half of 1921 and declined to make further allowances, on the ground that the useful life of the assets expired not later than 1921.

Petitioner's theory may be sound, but it is not supported by facts. The evidence does not show the time of acquisition, the March 1, 1913, value of the machinery acquired before that date, the useful life, or the machinery on hand in the taxable years. Such evidence as the record contains on this question is very unsatisfactory. The witness on this issue testified that some of the machinery in respect of which depreciation is now claimed might have been in use as long as ten years prior to January 1, 1912. As to such machinery, its ten-year life, which petitioner says is a proper average, was exhausted long before the taxable years. The witness further testified that the policy of the company was to record discards of machinery "valued in the thousands." Shortly thereafter he was asked whether the policy was to record "large discards of, say, roughly, $1,000," and in answer to this he said, " I could not definitely state what the policy would have been in those years." There is no evidence at all of the quantity of machinery discarded prior to the taxable years, and so even if the so-called cost at January 1, 1912, could be accepted as a starting point, we are still without a basis for computing depreciation in the taxable years. The witness above referred to is assistant treasurer and comptroller of petitioner; he has been connected with petitioner or its predecessors since 1900; and since 1915 the records of the American Electrical Works have been made under his direction. In this situation it seems to us that a more satisfactory account of the machinery on which depreciation is claimed might easily have been produced. On the record made we do not feel warranted in disturbing the respondent's determination as to depreciation on the American Electrical Works machinery.

In an amended answer respondent concedes that his allowance for depreciation on tenement houses of the American Electrical Works should be increased $1,398.65 for each of the years 1922 and 1923. Except for these adjustments, the respondent's determination of depreciation will not be disturbed.

In addition to the depreciation allowances, the consolidated net loss in 1921 and net income in 1922 is affected by the proper disposition to be made of the payments made to petitioner in each of those years by the New York and Rhode Island corporations out of gross income under the 1916 and 1919 contracts.

The consolidated returns filed by the affiliated group for 1921 and 1922 treat these items as income of petitioner and deductions of the paying corporations. The respondent made no alterations in the returns in respect to the manner in which petitioner treated the payments. The petitioner is now contending that the items are not business expenses of the New York and Rhode Island corporations, but dividends, and, as such, should be disallowed as deductions to the paying corporations and deducted from the gross income of petitioner under the provisions of section 234 (a) (6) of the taxing act. The respondent, on the other hand, asks that we affirm his action in not disturbing the items as returned, on the ground that they represent payments of royalty, and, as such, business expenses in accordance with *Kentucky Electric Lamp Co.*, 14 B. T. A. 603.

We are not aware of the designation given the payments in the returns or how respondent labeled them in his computation of the tax liability. The conclusion of respondent that they should be characterized as royalty payments is not discussed in his brief, he apparently having accepted it as a fact in view of the manner in which the amounts were termed in the agreements. From the showing made here it is evident that the sums were in reality distributions of profits.

Under the agreements there was an outright sale of the sellers' assets in the respective states, including the right to use the corporate name, trade-marks, trade names, and good will built up in the states, for all of the capital stock of the buyers, and in the case of the New York corporation, all of its 6 per cent bonds in the amount of $1,500,000. Each buyer also agreed to pay to the sellers for the exercise of the rights conveyed sums termed royalties and based upon a percentage of gross income computed in a specified manner. All of the property, tangible and intangible, was unconditionally conveyed. Manifestly, the purpose of the agreements was to transfer the business of the sellers in the respective states in exchange for all of the stock of the buyers. The only rights acquired not actually transferred were agreements on the part of the sellers to

make advances to the buyers from time to time for use as working capital.

The petitioner was in control of the transactions at all times. Everything points to the fact that the New York and Rhode Island corporations were organized by the parent for the express purpose of taking over the business being conducted in such states, and the evidence is that the directors of petitioner fixed the amount to be paid by the New York corporation. Thus it appears that the agreements did not result from negotiations conducted at arm's length, but were dictated altogether by the parent corporation.

In our interpretation of the agreements we are aided by the testimony of J. E. Hayward, petitioner's assistant treasurer and comptroller, who took part in the discussions at the time the agreements were made and was a member of the board of directors of the Maine corporation that authorized the first contract. His uncontradicted testimony is that the purpose of inserting the so-called royalty provisions in the agreements was to obtain the larger part of the earnings of the subsidiaries without a declaration of dividends.

It does not appear that the parent corporation was performing any service for the subsidiaries to form a basis for the payments other than the purchase of material required to produce their goods, and the charges were not imposed for the use of property belonging to the parent corporation, as the assets covered by the agreements were unconditionally transferred. Certainly no corporation exercising independent action would have undertaken the obligation to pay the sums paid for the mere right to receive advances for working capital when needed and to have another act as its purchasing agent for material. The agreements, construed in the light of surrounding facts, are contrary to such a conclusion. In our opinion the payments should be regarded as distributions of profits, and accordingly eliminated as deductions from gross income of the paying corporations and excluded from the net income of the petitioner by treating them as dividends under section 234 (a) (6) of the act.

For 1921 the respondent determined that each of the subsidiaries sustained a net loss, the total of the losses being $41,870.56 in excess of his determination of net income of the petitioner. For 1922 he found that the American Electrical Works and petitioner had net income and that the other subsidiary corporations had net losses. From the resulting consolidated net income of $417,989.65 he deducted the whole of the 1921 consolidated net loss. He now claims such action to be error and asks that the amount be limited to the proportion that the net losses sustained by the corporations having net income in 1922 bears to the whole net losses, in accordance with the rule announced in *Swift & Co.* v. *United States*, 38 Fed. (2d)

365. If the adjustments to be made in 1921 and 1922 in conformity with this opinion, including the recomputation of the consolidated net loss in 1921 by eliminating the dividend payments, result in a consolidated net loss, the same should be applied against any 1922 net income in accordance with the *Swift* case. *Kaiwiki Sugar Co., Ltd.*, 21 B. T. A. 997; *Gulf, Mobile & Northern Railroad Co.*, 22 B. T. A. 233.

The consolidated return filed for 1922 was accompanied by information returns executed by each subsidiary stating that none of the tax should be assessed against it. The consolidated return was signed by Frank C. Weidenmiller as vice president and Frank N. Phillips, as treasurer. Phillips was also president of petitioner in 1922. The returns of the Rhode Island and New York corporations were executed by the same persons in the same capacities. Of the other subsidiary corporations, only the American Electrical Works had net income and its return was signed by Phillips as president, and J. E. Hayward as treasurer. The tax of $24,780.32 shown to be due on the consolidated return was paid by the petitioner in 1923 in quarterly installments.

The respondent has found petitioner to be liable for the tax of the affiliated group for 1922, and this determination, in addition to being presumptively correct, is supported by the information returns filed by the several companies. The burden of proving the existence or nonexistence of an agreement for allocation of the tax is on the petitioner. *Morganite Brush Co.*, 24 B. T. A. 776; *Central Market Street Co.*, 25 B. T. A. 499. This burden it has not met. J. E. Hayward, vice president and comptroller of petitioner, testified that there was no written agreement among the companies requiring petitioner to pay all taxes. Whatever force his testimony might have in other circumstances is overcome by the information returns filed by the several companies. We accordingly hold that petitioner is liable for any deficiency in tax for 1922. Cf. *Bermont Oil Co.*, 22 B. T. A. 182; *Woodside Cotton Mills Co.*, 13 B. T. A. 266.

For the year 1923 a different situation exists. The parties agreed that for that year the subsidiary corporations filed information returns and it appears from the statement attached to the deficiency notice that the respondent examined such returns in determining the deficiency asserted. Those returns, however, were not placed in evidence and we have no knowledge of their contents. From the respondent's conduct in sending deficiency notices both to the petitioner and to two of the subsidiaries the fair inference is that there was no agreement that petitioner was to bear the tax of all. Certainly in these circumstances there can be no presumption that respondent acted rightly in asserting the whole deficiency against the petitioner. As to the year 1923 there is nothing to contradict

Hayward's testimony that no written agreement existed. We are accordingly of the opinion that for 1923 the tax should be apportioned to the several companies on the basis of the net income properly assignable to each. Section 240(a), Revenue Act of 1921. Cf. *Aragon Mills*, 17 B. T. A. 257.

Holding as we do that for 1923 petitioner is liable only for the portion of the deficiency which is attributable to its own net income, there is no occasion for considering the question of whether the deficiency asserted by respondent should be reduced by the deficiencies asserted against and paid by the subsidiaries based on their net income.
*Decision will be entered under Rule 50.*