*Decision will be entered under Rule 50.*

## HIMELHOCH BROTHERS AND COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 41728, 42769, 45663. Promulgated June 29, 1932.

*A. J. Levin, Esq.,* and *H. A. Mihills, C. P. A.,* for the petitioner. *John H. Pigg, Esq.,* for the respondent.

OPINION.

ARUNDELL: The contention being made that, because of its retroactive feature, the provisions of section 204(c) of the Revenue Act of 1924 violate the Fifth Amendment to the Constitution, is without merit. *John S. Garvan*, 23 B. T. A. 817, and cases therein cited, and *Newman, Saunders & Co.* v. *United States*, 36 Fed. (2d) 1009; certiorari denied, 281 U. S. 760.

The parties construe the facts relating to the assignment of the Hudson agreement differently. The petitioner contends that the Hudson agreement was transferred to the Arcade Company on or before March 1, 1923, and that the proper method of entering the transaction on the books of the Arcade Company would be to treat the payments to be received thereunder as a paid-in surplus to the extent of their then value. The respondent, on the other hand, claims that the agreement was assigned to the Arcade Company on March 15, 1923, in exchange for shares of its stock. This difference of opinion requires treatment before consideration is given to other phases of the issue.

For business reasons not necessary to enumerate, the former partnership of Himelhoch Brothers & Company considered it necessary to arrange for other quarters in which to conduct its business, with the result that in 1918 it entered into a 30-year lease on the Washington Arcade building, effective September 1, 1922. Thereafter on March 21, 1922, it disposed of its lease on the premises it then occupied by a sale to the J. L. Hudson Company at a price of $480,000, payable in monthly installments of $4,000, commencing April 1, 1923, when the partnership was to vacate the store. In July, 1922, the petitioner and the Arcade Company were incorporated. The petitioner took over the assets of the partnership, excepting the Hudson agreement and Hecker lease on the Washington Arcade building, in exchange for capital stock, and the Arcade Company accepted an assignment of the Hecker lease for its no par common stock. This left the Hudson agreement still in the hands of the Himelhochs, members of the former partnership.

The Arcade Company was without funds necessary to alter the Washington Arcade building to meet the needs of petitioner's business. To meet the financial problem arrangements were made with the Union Trust Company of Detroit during the early part of 1923 to purchase the Arcade Company's notes in the aggregate sum of $480,000, at 98 per cent of their face amount. The loan was completed by the execution on February 20, 1923, as of March 1, 1923, of an instrument in the form of a trust, under the terms of which the Hudson agreement, with other security, was pledged to pay the loan as the notes evidencing it matured. The agreement recites that the six members of the former partnership joined therein for the purpose of assigning and pledging the Hudson agreement. At that time the Himelhochs still owned the asset and the pledging of the contract as part security for the loan did not operate to assign any interest therein to the Arcade Company.

On March 15, 1923, the former partners met as stockholders of the Arcade Company and adopted a resolution providing for an increase of the corporation's capital stock from 10,000 to 18,680 shares of no par value stock, each share to have a fixed price of $20, and the surrender of the 9,500 shares of common stock then outstanding, and the reissue of it, together with the issue of the additional 8,680 shares, to the stockholders in proportion to their respective holdings in consideration of the transfer to the corporation of the Hudson agreement. In an instrument executed the same day the former partners assigned the agreement to the Arcade Company in consideration of the issuance of capital stock to them in accordance with the resolution. The agreement recites that it was the desire of the parties to consummate the exchange to carry out an understanding had with the Arcade Company a short time after its organization for the transfer of the agreement in exchange for the corporation's stock. The asset was taken up on its books and appeared in the corporation's balance sheet for July, 1923.

For unknown reasons the request on the State officials for authority to increase the Arcade Company's capital stock, as provided for in the resolution of March 15, 1923, was not filed until April 4, 1924. Thereafter, in April, 1924, the additional authorized no par stock was issued as agreed upon. With the transaction thus completed the stockholders held 18,180 shares of common stock, each of the fixed price of $20, received in exchange for their interest in the Hudson agreement and 500 shares of an equal price for other assets transferred by them.

We think these facts clearly show that capital stock of the Arcade Company was issued in exchange for the Hudson agreement, as contended by the respondent, and that the effective date of the transfer was March 15, 1923.

The provisions of the Revenue Act of 1921 govern for so much of the fiscal year ended January 31, 1924, as falls within the year 1923. Sec. 207 (a), Revenue Act of 1924. The Hudson agreement having been acquired by the Arcade Company subsequent to March 1, 1913, the basis is cost to it. *D. O. James Manufacturing Co.*, 17 B. T. A. 205. Where, as here, property is exchanged for stock, and there is no evidence as to the value of the stock, the value of the property when acquired establishes the cost of the asset to the transferee. *Rouse, Hempstone & Co.*, 7 B. T. A. 1018; *John Glackner Realty Corporation*, 11 B. T. A. 151; *Whiting Lumber Co.*, 21 B. T. A. 721; *Mead Realty Co.*, 21 B. T. A. 1062; *Melrose Trust Co.*, 22 B. T. A. 538.

The contract was with a large corporation of unquestioned financial standing; the performance of its terms was unconditionally guaranteed by its president, a man of considerable wealth, and the monthly installment payments of $4,000 have been paid as agreed. No difficulty was experienced in obtaining a bank loan of $480,000 largely upon the security of the contract. The original owners, the estate of Wolf Himelhoch, and the directors of the Arcade Company treated it as having a value at near the basic date of $363,600. In addition to these facts bearing upon the value of the asset, we have the testimony of Moses Himelhoch that the asset had a value at February 20, 1923, and March 1, 1923, of that figure. It does not appear that anything occurred during the first half of March, 1923, affecting the value of the asset.

The basis of the Hudson agreement in the hands of the Arcade Company is $363,600 for so much of 1923 as it was an asset in its hands.

The issue for the remainder of the fiscal year ended January 31, 1924, and other taxable years, is governed by the 1924, 1926 and 1928 Acts. These statutes provide that where property is exchanged for stock of a corporation after December 31, 1920, and the transferors receive the stock in substantially the same proportions as their interest in the property transferred and remain in control of the corporation, the basis is the same as it would be in the hands of the transferors, increased by the amount of gain or decreased by the amount of loss recognized to the transferors under the law covering the year of transfer. Sections 203 (b) (4), and 204 (a) (8) and (c) of the 1924 and 1926 Acts, and sections 111 (a), 112 (b) (5), 113 (a) (8), and 114 (a) of the 1928 Act.

The facts here bring the case squarely within the statute, leaving for decision only the determination of the cost basis and whether it should be increased or decreased for profit realized or loss sustained in the exchange transaction. Under the statutes the cost basis of the asset to the Arcade Company is the same as the transferors would be required to use had they retained the property, adjusted for gain or loss in the exchange. *Burlington Gazette Co.*, 21 B. T. A. 156; *Wobbers, Inc.*, 26 B. T. A. 322.

The respondent has determined that the transferors acquired the asset without cost. No evidence was offered to show the expenditure of any sum in connection with the acquisition of the Prentis lease in April, 1913, and in so far as the respondent's finding applies to the original lessees, it must be followed. Israel Himelhoch acquired one-third of his interest and Sadie H. Himelhoch and Gertrude Himelhoch Ashner acquired their 5 per cent interests, a total

of 15 per cent of the whole, by bequest of their father. The basis in the hands of these transferors is the fair market value of the property at the time of decedent's death. *Charles G. Barnes*, 8 B. T. A. 360; *Elizabeth Guthrie Heywood*, 11 B. T. A. 29. This value, which we have found from the evidence to be $52,314.31, represents cost to these transferors. It follows that the basis in the hands of the Arcade Company must be the same, viz., $52,314.31, unless it should be increased by gain realized by the transferors in the exchange.

Whether gain was realized is governed by the 1921 Act. Section 202 (c) (3) of that act provides that no gain or loss shall be recognized in cases where immediately after an exchange of real, personal or mixed property by two or more persons for stock of a corporation, the transferors are in control of such corporation and the stock received by the transferors is in substantially the same proportion as their interests in the property before the transfer. The transferors of the Hudson agreement received the stock of the Arcade Company in proportion to their interests in the asset assigned and thereafter controlled the assignee. The exchange was not a taxable transaction to the Himelhochs under the 1921 Act and the Arcade Company is not entitled to an increase of the basis of the asset in its hands.

For each of the taxable years to which the remaining issue applies the respondent proposes to assess the deficiencies against the petitioner on the ground that an agreement exists between it and the Arcade Company as a basis for such action. His determination of the existence of such an understanding will be followed in the absence of proof that it is wrong. *Morganite Brush Co.*, 24 B. T. A. 776; *Central Market Street Co.*, 25 B. T. A. 499; *Washburn Wire Co.*, 26 B. T. A. 464.

It is not necessary that the agreement be in writing or of any particular form, it being sufficient if, from the record, an agreement or understanding may be inferred from the course of conduct of the interested parties. *American Textile Woolen Co.*, 23 B. T. A. 670.

The regulations promulgated by the respondent for the enforcement of the 1924 and 1926 Acts specifically provide for the filing by affiliated corporations of Form 1122 and that the principal corporation filing a consolidated return shall attach thereto a schedule showing the amount of tax which it is agreed is to be assessed against each affiliated corporation. Art. 632, Regulations 65 and 69. Article 731 of Regulations 74, covering the 1928 Act, provides for the inclusion in the return of any agreement among affiliated corporations as to the amount of the whole tax to be assessed against each.

In this case all of the returns, consolidated and information, were signed by M. Himelhoch, as treasurer. All of the information returns, and the consolidated returns for 1924, 1925 (amended) and 1926 were also signed by Z. Himelhoch as president and second vice president, respectively. The remaining returns were also signed by H. Himelhoch as president. The information return executed for 1924 stated that none of the tax should be assessed against the Arcade Company, the returns for 1925 and 1926 left blank space provided for the answer, and the answer to the question contained in the return filed for 1927 was indicated by the figure naught.

The returns for the fiscal years 1924 and 1927 clearly and definitely advised the Commissioner that no part of the tax was to be assessed against the Arcade Company, and we think the returns for the fiscal years 1925 and 1926 show in no less convincing terms that the agreement between the companies was that the tax be assessed against the petitioner. The forms provided by the Commissioner were specifically designed for the return of information as to the manner of apportioning the tax to be assessed and when these forms were executed, as they were, with the space left blank for the amount to be assessed against the Arcade Company, the only reasonable conclusion was that it was intended that the entire tax be assessed against the petitioner.

Although the notices of deficiency advising petitioner of the determination of the respondent to assess the additional amounts found to be due under the consolidated returns against it were mailed during the latter part of 1928, no question was raised of the absence of an agreement until the filing of amended petitions a few days before the hearing. We think petitioner is construing the absence of a signed agreement between the parties as the absence of any agreement. Moses Himelhoch, who was treasurer of both companies and signed all returns and all petitions, apparently never questioned the matter until the last minute, and his testimony in the trial of the case was simply that he had been unable to find a written agreement.

The stock of the affiliated corporation throughout the taxable years was held by the same persons in the same proportion and it would seem to make no difference to the stockholders whether the deficiencies were assessed against the petitioner or apportioned between petitioner and the Arcade Company in accordance with the income assignable to each.

We think there are sufficient grounds for sustaining the respondent on this issue and, accordingly, hold agreements exist for all years involved to assess the deficiencies against petitioner.

*Decisions will be entered under Rule 50.*