Horace Drew and Betty B. Drew, et al., [1] v. Commissioner. Drew v. Commissioner
Docket Nos. 4134-69, 4154-69, 4155-69, 4156-69.
United States Tax Court
T.C. Memo 1972-40; 1972 Tax Ct. Memo LEXIS 215; 31 T.C.M. (CCH) 143; T.C.M. (RIA) 72040; February 17, 1972, Filed. William R. Frazier, 816 Atlantic Nat'l Bank Bldg., 121 West Forsyth St., Jacksonville, Fla., for the petitioners. Robert W. Goodman, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in Federal income taxes and additions thereto under section 6653(a) [2] as follows: *2*HORACE DREW and BETTY B. DREW
*2*(Docket No. 4134-69)
Year
Deficiency
1962
$879.61
1963
505.83
*3*THE H. & W. B. DREW COMPANY
*3*(Docket No. 4154-69)
Taxable Year
Addition
Ending
Deficiency
to Tax
6/30/63
$84,097.41
$4,204.87
6/30/64
2,365.62
118.28
6/30/67
328.91
16.45
*3*CHARLES FLEMING PARKE AND REGINA W. PARKE
*3*(Docket No. 4155-69)
Addition
Year
Deficiency
to Tax
1958
$12,249.19
$ 612.46
1959
11,920.98
596.05
1960
10,582.07
529.10
1961
11,942.88
597.14
1962
22,215.87
1,110.79
1963
8,611.60
430.58
*219 *2*ESTATE OF E. HODSON DREW,Deceased, edward/ deBELLEDREW and
*2*SHERWOOD DREW ROBINSON, AS ADMINISTRATORS, AND @JESSIE deBELLE
*2*DREW, SURVIVING WIFE
*2*(Docket No. 4156-69)
Year
Deficiency
1959
$ 5,927.68
1960
2,737.73
1961
115.47
1962
17,641.65
1963
4,181.26
1964
$ 1,943.67
1965
4,263.19
1966
14,009.15 The issues for decision are as follows: (1) Whether The H. & W. B. Drew Company is entitled to deductions under section 162(a) for salary payments to Marguerite Drew Bardin for each of its taxable years ending June 30, 1960, through June 30, 1967; (2) Whether The H. & W. B. Drew Company is entitled to deductions under section 162(a) for travel expenditures in excess of the amounts allowed by respondent for each of its taxable years ending June 30, 1960, through June 30, 1964; (3) Whether The H. & W. B. Drew Company is entitled to deductions under section 162(a) for dues and subscription expenses in excess of the amounts allowed by respondent for each of its taxable years ending June 30, 1960, through *220 June 30, 1964; (4) Whether The H. & W. B. Drew Company is entitled to a deduction under section 165(g) for a loss resulting from the worthlessness or abandonment of a debenture and stock in Selva Marina Country Club in its taxable year ending June 30, 1963; (5) Whether The H. & W. B. Drew Company is entitled to deductions for additions to its reserve for bad debts under section 166(c) in its taxable year ending June 30, 1965, to correct an error in its accounts receivable control account and to adjust for uncollectible accounts receivable; 146 (6) Whether The H. & W. B. Drew Company is entitled to a deduction in excess of the amount allowed by respondent under section 165(a) for a loss resulting from the abandonment of its building plans during its taxable year ending June 30, 1967; (7) Whether, for purposes of computing the alternative tax under section 1201, The H. & W. B. Drew Company is entitled to reduce its net long-term capital gain for its taxable year ending June 30, 1963, by the excess of its net operating loss deduction under section 172 over its ordinary income for that year; (8) Whether The H. & W. B. Drew Company is liable for additions to tax under section *221 6653(a) for its taxable years ending June 30, 1963, 1964, and 1967; (9) Whether E. Hodson Drew converted to his own use funds advanced to him by The H. & W. B. Drew Company and thereby realized dividends under section 301 during 1959 through 1964; (10) Whether E. Hodson Drew is entitled to deductions under section 162(a) for 1964, 1965, and 1966 for expenses incurred as a commission salesman for Automatic Voting Machine Corporation in excess of the amounts allowed by respondent; (11) Whether E. Hodson Drew is entitled to a deduction under sections 165(a) and 1231 for a loss incurred on the foreclosure during 1966 of a mortgage on a building which he owned; (12) Whether E. Hodson Drew is entitled to a loss deduction under section 165(a) for freeze damage to two citrus groves during 1962; (13) Whether E. Hodson Drew is entitled to a casualty loss deduction under section 165(a) for 1964 for storm damage to a boat dock; (14) Whether E. Hodson Drew omitted from his returns for 1959 and 1960 amounts of gross income in excess of 25 percent of the amounts thereof stated in his returns for each of those years so that the bar of the statute of limitations on assessments is lifted *222 by section 6501(e)(1); (15) Whether Horace Drew received income from The H. & W. B. Drew Company during 1962 and 1963 in addition to the amounts reported in his income tax returns for those years as a result of his personal use of travel and other expense funds advanced to him by The H. & W. B. Drew Company; (16) Whether Charles Fleming Parke converted to his own use funds advanced to him by The H. & W. B. Drew Company and thereby realized income during 1958 through 1963; (17) Whether Charles Fleming Parke omitted from his income tax returns for 1958, 1959, and 1960 amounts of gross income in excess of 25 percent of the amounts thereof stated in his returns for each of those years so that the bar of the statute of limitations is lifted by section 6501(e)(1); and (18) Whether Charles Fleming Parke is liable for additions to tax under section 6653(a) for the years 1958 through 1963. Findings of Fact General The principal place of business of The H. & W. B. Drew Company (hereinafter referred to as Drew Company or Company) at the time it filed its petition in docket No. 4154-69 was located in Jacksonville, Florida. It filed corporate income tax returns for its taxable years *223 ending June 30, 1960, through June 30, 1967, with the district director of internal revenue, Jacksonville, Florida. The Estate of E. Hodson Drew, Deceased, Edward deBelle Drew and Sherwood Drew Robinson, as Administrators, and Jessie deBelle Drew, Surviving Wife, are the petitioners in docket No. 4156-69. The administrators and Jessie deBelle Drew were legal residents of Jacksonville, Florida, at the time the petition was filed. E. Hodson Drew and Jessie deBelle Drew filed joint Federal income tax returns for 1959 through 1966 with the district director of internal revenue, Jacksonville, Florida. E. Hodson Drew died July 26, 1967. Horace Drew and his wife, Betty B. Drew, were legal residents of Tallahassee, Florida, at the time they filed their petition in docket No. 4134-69. They filed joint Federal income tax returns for the years 1962 and 1963 with the district director of internal revenue, Jacksonville, Florida. Charles Fleming Parke and his wife, Regina W. Parke, were legal residents of Jacksonville, Florida, at the time they filed their petition in docket No. 4155-69. They filed joint Federal income tax returns for the 147 years 1958 through 1963 with the district director *224 of internal revenue, Jacksonville, Florida. Many of the issues presented for decision arise from the operations of Drew Company. This company was incorporated in 1893 under the laws of Florida. Since that time its principal business has consisted of the sale of office supplies, office equipment, and office printing; about 85 percent of this business has been done with government agencies. For 1960 through 1967, Drew Company kept its books and filed its income tax returns, using the accrual method of accounting and a fiscal year ending June 30. [3] The Company's gross income during that period declined from a high in 1960 of about $1,769,000 to a low in 1967 of about $598,000. Issue 1. Bardin's Salary Findings of Fact E. Hodson Drew (hereinafter Hodson) and Marguerite Drew Bardin (hereinafter Bardin), brother and sister, were the major beneficiaries of the Estate of Mary H. Drew which owned 75 percent of the outstanding common and preferred stock of Drew Company. By the terms of Mary H. Drew's will, Hodson was given the right to vote *225 this stock while it was held by the estate; the estate continued to hold the stock throughout the years here in issue. In addition, Hodson individually owned 21 percent of the Company's outstanding common stock. During its taxable years ending in 1960 through 1967, Drew Company paid no dividends. Bardin was a vice president and director of Drew Company. In these capacities she was frequently called upon by Hodson for advice in making business decisions, and was occasionally requested to sign checks. Bardin also attended meetings of the board of directors which were held at least once a year. None of the directors were compensated for the services which they performed in that capacity, but most, if not all, of them drew salaries from the Company in other capacities. Drew Company paid Bardin $6,000 per year during its taxable years ending in 1960 through 1967, and claimed deductions therefor in its returns for those years. Respondent has disallowed the claimed deductions. The sum of $1,500 per annum was reasonable compensation for the services performed by Bardin. Opinion Taking all relevant factors into account, Mayson Mfg. Co. v. Commissioner, 178 F. 2d 115, 119 *226 (C.A. 6, 1949); Dahlem Foundation, Inc., 54 T.C. 1566, 1580 (1970), we think the $6,000 annual payment was excessive, i. e., that it exceeded a "reasonable" allowance for salaries or other compensation, within the meaning of section 162(a)(1), for the services performed by Bardin. We find that $1,500 per annum for the period in dispute is deductible as compensation for her services as director, for her work in signing checks, and for giving advice on various business activities of the Company. Issue 2. Travel Expenses Findings of Fact During its taxable years ending in 1960 through 1964, Drew Company obtained approximately 85 percent of its business from government agencies. In order to retain and augment this business, the Company felt it wise to have both Hodson and Charles Fleming Parke (hereinafter Parke) attend all conventions of tax assessors, county judges, county commissioners, and tax collectors in the State of Florida. These conventions were usually held once and, sometimes, twice a year. At these meetings Hodson and Parke customarily engaged a suite of hotel rooms, furnished it with drinks, and invited numerous guests. In addition, Hodson, Parke, and *227 other salesmen for Drew Company spent a considerable amount of time traveling in order to obtain business. Hodson and Parke each spent approximately 80 percent of their time traveling on business for the Company. When Hodson, Parke, or other salesmen made trips for the benefit of Drew Company they frequently received travel advances. A check in the amount of each advance was made payable to the individual recipient and was reflected on the Company's books as a debit to an account receivable carried in such individual's name. When documentation for the expense was submitted, the bookkeeper credited the individual's account receivable and debited the travel expense account for the substantiated amount. The accounts of Horace Drew 148 (hereinafter Horace), Hodson Drew, Jr., and Edward Drew were credited, and the travel expense account debited each month not only with documented expenses but also with additional amounts - ranging from $25 to $75 - designated as "Travel Allowance." Hodson, Parke, and Horace sometimes failed to submit any substantiation for their travel expenses so that the advances were not charged to the travel expense account in the ordinary course of business, *228 and they accumulated in the accounts receivable maintained in the individuals' respective names. On the last days of the Company's taxable years ending in 1961, 1962, and 1963, the bookkeeper was directed by letters from either Hodson or Parke to credit the accounts receivable and debit the travel expense account as follows: Account
Year
Payable
Amount
1961
Hodson
$11,118.15
Parke
2,952.84
1962
Hodson
5,806.15
1963
Horace
9,525.76 No documents substantiating these expenses were presented to the bookkeeper. The credit to Horace's account receivable in 1963 ($9,525.76) completely eliminated the debit balance which had built up in that account. Only $6,152.68 of that balance, however, was created by travel advances not later charged to the Company's travel expense account. (See Issue 15, infra, where the difference of $3,373.08 is discussed.) Of these travel expenses, only $2,641.96 was incurred during the year ending in 1963; the remainder was incurred in other years. In its returns for its taxable years ending in 1960 through 1964, Drew Company claimed deductions for travel expenses, portions of which were disallowed, as follows: Taxable
Year
Claimed
Amount
Ending
Deduction
Disallowed
1960
$33,983.99
$ 2,401.04
1961
45,448.34
16,951.97
1962
33,167.32
11,490.49
1963
38,439.08
16,239.44
1964
27,080.52
5,625.93
*229 Ultimate Findings of Fact Drew Company incurred travel expenses for which additional amounts are deductible as follows: [4]
Taxable Year
Ending
Amount
1960
$ 2,401.04
1961
16,951.97
1962
11,054.99
1963
4,677.82
1964
0
Opinion Drew Company has conceded that it does not meet the substantiation requirements of section 274. However, since that section applies only to the expenses incurred after December 31, 1962, sec. 1.274-8, Income Tax Regs., the Company contends that the disallowance of portions of the claimed travel expense deductions for its taxable years ending on June 30, 1960, 1961, and 1962, and the expenses incurred prior to December 31, 1962, i. e., during the first six months of its taxable year ending in 1963, was erroneous. Upon consideration of the evidence, we are convinced that officers and employees of Drew Company traveled extensively in securing business. Shortly after each trip was taken, the Company's bookkeeper regularly charged the adequately substantiated costs to the travel expense account, *230 and respondent has not questioned the vast majority of those accruals. With one exception, we find that the specific expenses charged to the travel expense account in the regular course of Drew Company's business constitute deductible expenditures. The one exception is the cost of a trip by Hodson Drew, Jr., to Mexico which was charged to the travel expense account on January 31, 1962. No evidence relating specifically to this $435.50 trip was introduced, and there is no evidence whatever that Drew Company had business to transact in Mexico. We further find that the cash travel allowances given to Horace Drew, Hodson Drew, Jr., and Edward Drew constitute deductible expenses of the Company. These amounts were expended by the Company over and above such major traveling expenses as plane fares and hotel costs. Such amounts were advanced to these individuals, all traveling salesmen for the Company, we infer, to recompense then for such items as cab fares and tips for which they were not otherwise specifically reimbursed. In view of the extensive nature of the traveling which the salesmen were required to undertake and the relatively small amounts of 149 these monthly allowances, *231 we find that such allowances were not excessive. [5] See Eitingon-Schild Co. and Subsidiaries, 21 B.T.A. 1163, 1175-1176 (1931), acq. X-2 C.B. 21. The remaining travel expenses claimed as deductions by Drew Company and disallowed by respondent consist of the yearend accruals, amounts added to the travel expense account at the direction of Hodson or Parke on the last days of the taxable years ending in 1961, 1962, and 1963. Hodson was dead at the time of the trial, but the accountant who prepared the Company's tax returns testified that he was satisfied that Hodson had determined the amounts of his travel expenses by reference to detailed records which he had maintained to document his expenditures. While those records were not located and made available for examination by the revenue agents or introduced at the trial, other evidence indicates that the amount of the travel expenses claimed to have been incurred by Hodson in the Company's behalf is reasonable. *232 In the light of all the evidence, particularly the extensive amount of his travels - occupying 80 percent of his time - we find that the accruals of travel expenses incurred by Hodson are deductible by the Company. Similarly, we find that the accrual for Parke's travel expenses computed on the basis of retained hotel receipts and estimated entertainment costs is deductible by the Company. The last year-end accrual, that for Horace, presents a different set of problems. This accrual removed from Horace's account receivable $6,152.68 of travel advances which had accumulated in his account because of his failure to present to the bookkeeper documents substantiating the expenses. From our review of the record, we think that Horace spent as much in traveling on Company business as the amount of the advances and that Drew Company is entitled to deductions for those expenses. However, the record shows that those expenses were not all incurred during the Company's taxable year ending in 1963. From an analysis of Horace's account receivable and the other relevant evidence, we have found that the expenses incurred in 1963 were in the amount set forth in our Findings. See also Issue 15, infra. *233 One further issue remains with respect to the travel expenses. While Drew Company concedes that it is not entitled to any additional deductions for travel expenses incurred after December 31, 1962, the amount of the expenses incurred prior to that date remains to be determined. Applying the rule of Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930), and using our best judgment, we have found that an amount of $4,677.82 in excess of the amount allowed by respondent is deductible by Drew Company for its fiscal year ending in 1963. Issue 3. Dues Expense Findings of Fact Drew Company paid the dues for some of its officers and employees at various business, social, and country clubs. One of these was the River Club, a businessmen's club in Jacksonville, Florida. Company officials used this club as a place to entertain clients and business associates and as a place to meet business and professional people in the Jacksonville area. In addition, Drew Company paid its sales manager's dues at the Selva Marina Country Club. He was expected to use the facilities of this club to entertain current customers and to meet prospective ones. Hodson's dues at the Florida Yacht Club, *234 primarily a social club, were also paid by the Company. In its tax returns, Drew Company claimed deductions for the dues which it paid. Respondent has disallowed the claimed deductions in the following amounts: Taxable Year
Ending
Club
Amount
1960
River Club
$ 345.60
Selva Marina Country Club
234.00
Florida Yacht Club
201.60
Miscellaneous
170.00
$ 951.20
1961
River Club
$ 345.60
Florida Yacht Club
201.60
Miscellaneous
90.00
$ 637.20
1962
River Club
$ 327.60
Florida Yacht Club
201.60
Miscellaneous
29.00
$ 558.20
1963
River Club
[1] $ 528.00
Florida Yacht Club
201.90
Miscellaneous
470.00
$1,199.90
1964
River Club
$ 396.00
Florida Yacht Club
205.20
Miscellaneous
370.80
$ 972.00
Opinion On brief, Drew Company has conceded that, since it failed to meet the substantiation requirements of section 274, it is not entitled to any deductions for dues expense incurred after December 31, 1962. It contends, however, that the remainder of these expenses are deductible as "ordinary and necessary" expenses under section *235 162(a). Our Findings reflect the portion of the dues expense which was incurred prior to January 1, 1963, and the remainder of our Opinion on this issue will refer only to those expenses. The evidence indicates that Drew Company officers used the River Club primarily as a place to entertain clients at lunch. According to the undisputed testimony, this club is a place where prominent business and professional people in the Jacksonville area eat lunch. We find, on the basis of this record, that the Company is entitled to a deduction for the dues for membership in this club as "ordinary and necessary" expenses of carrying on a trade or business. Sec. 162(a). We also hold that the dues for Selva Marina Country Club during the Company's taxable year ending in 1960 are deductible by Drew Company. The membership in that club was procured for the Company's sales manager, who is not a member of the Drew family, and was used by him to entertain clients. We note that respondent has determined that the dues paid to that club during 1961 are deductible, and we find no reason to distinguish between the two years. As to the Florida Yacht Club dues, the Company has failed to carry its burden *236 of showing that they constitute ordinary and necessary business expenses. Welch v. Helvering, 290 U.S. 111 (1933); Rule 32, Tax Court Rules of Practice. The club is primarily a social one, and the membership was procured for Hodson Drew, the president and controlling stockholder of the Company. No evidence was introduced to show that this club membership was used for business purposes. We also find that the "miscellaneous" dues and expenses are not deductible. No evidence whatever was introduced to establish the nature of those expenditures. Consequently, the Company has not carried its burden of proof on that issue. Issue 4. Worthlessness or Abandonment of Stock Findings of Fact On August 18, 1958, Drew Company purchased for $250 a membership in the Selva Marina Country Club of Atlantic Beach, Florida, this membership was represented by 1 share of stock in The S.M. Company. On December 22, 1959, it also purchased a "20-Year Two Per Cent Appreciation Debenture Note" of The S.M. Company. In its return for its taxable year ending June 30, 1963, Drew Company claimed a $755.05 long-term capital loss from its Selva Marina stock. Respondent determined that no loss *237 was allowable because "it has not been established that such stock became worthless within the taxable year." Opinion Petitioner's sole argument for allowing the claimed loss is that "For some reason, The Drew Company did not utilize the facilities of the Selva Marina Country Club commencing with the period July 1, 1962." The Company's failure to use the club facilities does not show that either the stock or the debenture became worthless during the tax year. Consequently, no deduction is allowable for their costs. Issue 5. Write-off of Accounts Receivable (1965) Findings of Fact Drew Company sold much of its merchandise on credit. These sales were recorded on accounts receivable ledger cards and in a general ledger control account. At least since 1956, the Company also employed a reserve for bad debts. During its taxable years ending in 1956 through 1965, the Company charged bad debts off against that account, made additions to the account, and claimed deductions for bad debt expenses as follows: 151 Tax-
Deduction
able
Claimed
Year
Reserve at
for Bad
End-
Beginning
Debts
Additions
Debt
ing
of Period
Charged off
to Account
Expense [1]
1956
$38,254.12
$11,325.39
$ 9,453.12
$ 8,858.13
1957
36,381.85
7,122.12
465.38
1958
29,725.11
3,743.60
1959
25,981.51
4,090.10
14 ,807.07
14,100.00
1960
36,698.48
51,058.84
28,028.24
27,613.23
1961
13,667.88
3,434.96
1962
10,232.92
7,081.65
1963
3,151.27
26,007.88
37,644.52
37,529.37
1964
14,787.91
6,837.61
10,459.24
1965
18,409.54
12,627.83
1,671.91
*238 In April 1965, Roy H. Clarke (hereinafter Clarke) joined the Company as a vice president-controller. He quickly discovered that the accounts receivable ledger cards did not accurately reflect the value of those accounts. Some accounts were long overdue, and others represented sales made under such circumstances as to indicate that payment was improbable. At times, for example, sales were made to Duval County without purchase orders having been executed and before funds had been budgeted for the purchases. The county frequently failed to keep records of either the merchandise it ordered or received. However, the Company officers thought that all the merchandise sold would be paid for, and they reported the sales as income. In a report addressed to the president of the Company on March 10, 1966, Clarke summarized the ways in which "normal practices for controlling accounts receivable" had not been followed in these paragraphs: (1) Detail of Accounts Receivable ledger cards were not balanced monthly with the general ledger *239 control account. (2) When payments were received from customers they were not keyed off against specific charges thus making it difficult, and in old accounts, almost impossible to determine the unpaid invoices to support an account balance. (3) Unpaid balances of accounts with governmental units - County, State, and Federal - were carried forward from year to year without write-off, or adjustment of any kind. Some accounts have been active for periods ranging up to 30 or more years, and the research necessary to establish open invoices, and to support these with evidence of delivery, would be so voluminous as to be impractical. This is particularly so when you consider that these agencies all usually operate on budgets, or appropriated funds, for each specific year. It is my opinion even if the tremendous research necessary to establish valid claims were carried out, that budget practices would prevent collecting past-due items without litigation. (4) Past-due accounts were not aged and there was no evidence of an aggressive collection program. In order to obtain a more realistic value for the accounts receivable, Clarke initiated vigorous collection procedures and kept close *240 record of the payments received. After he had devoted 10 months to efforts to collect amounts due and to identify the invoices for which payments had been received, he proceeded to analyze the accounts receivable to determine the amounts which should be written off as uncollectible. As a result of this review, Clarke recommended that $143,195.41 of the accounts receivable be written off during the Company's taxable year ending in 1965. Some of the ledger cards showed credit balances in the customers' favor; Clarke recommended that these balances, in the total amount of $11,576.01, be treated as miscellaneous income. Further, the total amount of the accounts receivable detailed in the ledger cards did not correspond with the balance in the general ledger control account, and he recommended that the control account balance be reduced by $21,490.26 in order to correct this discrepancy. Clarke's report stated: The aggregate amounts to be written off are substantial but since they represent the accumulation of many years, they are understandably large. A further adjustment is needed to bring the ledger card detail into balance as of June 30, 1965, with the general ledger control account. *241 During the first month of my employment (April, 1965) I instituted a monthly procedure to run tapes of ledger card balances. An initial tape is run each month and then a record to prove the accuracy of the first. The following discrepancies were found: Cumula-
tive
Ledger
Control
Discrep-
Date
Cards
Account
ancy
April 30, 1965
$317,564.19
$332,644.27
$15,080.08
May 31, 1965
301,375.08
318,265.34
16,890.26
June 30, 1965
279,110.59
300,600.85
21,490.26
Good accounting practice requires that the cumulative discrepancy of $21,490.26 be adjusted by reducing the general ledger control account balance to agree with ledger cards. Again, this is a substantial amount but represents an accumulation over a period of many years. I have no explanation for the increase 152 of some $6,500 during the period from April 30th through June 30th, other than I had not as yet established tight control of the various phases of the accounts receivable operation. The total adjustment required is as follows: Write Off-Uncollectibles
$143,195.41
Adjustment to Control
21,490.26
TOTAL
$164,685.67
I recommend that this total adjustment *242 be taken as of June 30, 1965, to reflect an accurate value of Customer Accounts Receivable as of that date. * * * On the basis of Clarke's report, entries were made in the books of the Company reducing the accounts receivable. The specific accounts reduced and the amounts of the reductions of each are set forth in the record. The accounts written off were divided into five categories: Trade Accounts, County Accounts, County Boards of Public Instruction Accounts, State of Florida Accounts, and U.S. Government Accounts. Each of these categories of accounts was also analyzed to determine the age of the accounts written off. This analysis disclosed: *4*Sales Made During Taxable Years
*4*Ending
Before
1961
1961
Accounts
Trade
$ 793.61
County
72,161.53
3,975.17
4,154.33
County Boards
5,268.94
278.63
1,729.58
of Public Instruction State of
10,720.66
5,511.48
2.75
Florida Government
177.92
Totals
$88,329.05
$9,765.28
$6,680.27
*5* Sales Made During Taxable Years
*5*Ending
1962
1963
1964
1965
Trade
$ 5.12
$1,704.42
$ 4,546.25
County
3,368.70
5,118.26
15,362.54
County Boards
375.34
325.48
282.68
of Public Instruction State of
119.02
1,851.98
1,828.70
Florida Government
2,230.45
37.46
1,264.
Totals
$6,098.63
$9,037.60
$23,284.58
*243 The write-off of accounts receivable ($143,195.41) and the adjustment to the control account ($21,490.26) were applied to reduce Drew Company's gross sales during its taxable year ending in 1965 by $164,685.67. The reserve for bad debts - maintained at 5 percent of the total amount of the accounts receivable - was also reduced by $12,627.83; this reduction was required in order to reflect the reduced amount of outstanding accounts receivable. Correspondingly, the accounts receivable control account was reduced by $153,109.66 ($164,685.67 less the $11,576.01 total credit balances in the accounts receivable ledger cards), and miscellaneous income was increased by $24,203.84, the sum of the credit balances in the accounts receivable ledger cards ($11,576.01) plus the amount by which the reserve for bad debts was reduced ($12,627.83). The following journal entries were made on the books and records of Drew Company to reflect these adjustments: Debit
Credit
Sales
$164,685.67
Reserve for Bad Debts
12,627.83
Accounts Receivable
$153,109.66
Miscellaneous Income
24,203.84
In the Company's return for its taxable year ending in 1965, the adjustment to sales *244 ($164,685.67) was reflected as a decrease in the amount of sales reported, and the miscellaneous income ($24,203.84) was included with the "other income" reported in the return. Respondent determined that the $164,685.67 "reduction in sales, representing accounts receivable written off against sales, is not allowed because it has not been established that such accounts became worthless within the taxable year." He further determined that the $24,203.84 included as part of the other income reported in the return "does not constitute taxable income" and reduced the Company's gross income by that amount. Opinion We note that, at least since 1956, Drew Company has used the reserve method authorized by section 166(c) for computing its bad debt deductions. Under this method, a taxpayer "may deduct from gross income a reasonable addition to a reserve for bad debts in lieu of deducting specific bad debt items." Sec. 1.166-4(a), Income Tax Regs. "What constitutes a 153 reasonable addition to a reserve for bad debts" must be determined "in the light of the facts existing at the close of the taxable year of the proposed addition." Sec. 1.166-4(b), Income Tax Regs. "In the event that *245 subsequent realizations upon outstanding debts prove to be more or less than estimated at the time of the creation of the existing reserve, the amount of the excess or inadequacy in the existing reserve shall be reflected in the determination of the reasonable addition necessary in the current taxable year." Sec. 1.166-4 (b)(2), Income Tax Regs.
In substance, the Drew Company here contends that its additions to the reserve account prior to 1965 were inadequate so that the debts found to be bad during 1965 exceeded the balance in the account. Therefore, it contends, the addition to the reserve for 1965 must be large enough not only to provide for anticipated future bad debts but also to correct for the inadequacy in the existing reserve. New York Water Service Corporation, 12 T.C. 780, 788 (1949). The adequacy of the bad debt reserve depends, in part, upon the amount of the debts found to be bad during the year. The determination of whether a debt is worthless is to be made on the same basis, regardless of whether the taxpayer charges off specific bad debts or uses the reserve method. Paramount Liquor Co. v. Commissioner, 242 F. 2d 249, 258-259 (C.A. *246 8, 1957), affirming a Memorandum Opinion of this Court. This determination is to be made by the "exercise of sound business judgment based upon as complete information as is practically obtainable." Isadore Schuman, 20 B.T.A. 1167, 1168 (1930). While there is some latitude in determining when a debt has become bad, the test to be employed is whether the surrounding facts and circumstances would lead a reasonably prudent businessman to conclude that it is uncollectible. Giffin Andrew, 54 T.C. 239, 248 (1970), acq. 1970 C.B. xviii; Morganite Brush Co., 24 B.T.A. 776, 784 (1931). Although the normal procedure for establishing the uncollectibility of a debt is to show that the debtor is incapable of paying it, that is not the only available method. A showing that the claim cannot be legally enforced and that the debtor has no intention of paying it is also sufficient to establish its worthlessness. In Clay Drilling Co. of Taxas, 6 T.C. 324 (1946), acq. 1946-2 C.B. 1, a supplemental agreement provided that an existing debt would be paid only out of funds received from a specified source and that the debtor would no longer *247 be personally liable for the debt. When funds from that source were no longer available, this Court held that the taxpayer was entitled to a bad debt deduction even though the debtor remained financially solvent. Similarly, in Robert S. Dennison, 4 T.C. 806 (1945), acq. 1945 C.B. 2, where the statute of limitations prevented the enforcement of a debt and the debtor's attitude indicated that he would not voluntarily pay it, this Court held that the taxpayer was entitled to a bad debt deduction. Cf. also First National Bank of Bellflower, 10 T.C. 357 (1948), acq. 1948-1 C.B. 2. In the instant case, Clarke devoted approximately 10 months in a concerted effort to collect the outstanding accounts receivable of Drew Company. To assist in these efforts, he hired additional temporary employees. He wrote numerous letters and kept detailed records of the payments received. After this 10-month period he made a thorough review of the accounts receivable to determine which of them would be voluntarily paid. He also reviewed the accounts to determine which of them could be collected through litigation. He found the Company's records in many cases *248 to be inadequate to serve as a predicate for lawsuits. When his study of the accounts receivable was completed, Clarke made detailed recommendations as to the specific accounts and amounts that should be written off as uncollectible, and these recommendations were followed by Drew Company. Subsequent events have verified Clarke's conclusions; little has been collected on any of the accounts written off during 1965. The accounts which were written off represent sales made to various private businesses and government agencies. While some of the sales to the government agencies were irregular in that they were made in advance of budget appropriations and without formal purchase orders, Drew Company officials at all times expected that the merchandise would be paid for, and it frequently was, even though payment sometimes came only after delays of two or more years. Drew Company always reported the sales in its returns for the years in which they were made. We are satisfied that the accounts receivable represented bona fide debts. Sec. 1.166-1(c), Income Tax Regs. 154 In view of the nature of Drew Company's business, its experience record in collecting its accounts receivable, *249 and the manner in which it handled its accounting, we find that its officers reasonably believed that the accounts receivable representing sales during the taxable years ending in 1961 through 1965 ($54,866.36) were collectible at the beginning of its taxable year ending in 1965. It was not until Clarke began to vigorously press for payment late in 1965 that it became apparent that some of the accounts could not be collected and that the balance in the reserve account was inadequate. Drew Company is entitled to a deduction for an addition to its reserve account for 1965 which reflects this inadequacy. Mill Factors Corporation, 14 T.C. 1366, 1372-1373 (1950); Houston Chronicle Publishing Co., 3 T.C. 1233, 1242-1243 (1944). However, we think that the exercise of reasonable diligence by the officers of Drew Company would have disclosed that the accounts receivable attributable to sales made prior to the Company's taxable year ending in 1961 ($88,329.05) were uncollectible prior to the Company's taxable year ending in 1965. Since it has not been shown that these accounts became worthless during 1965, no deduction is allowable for any addition made to the bad *250 debt reserve to reflect them. Paramount Liquor Co. v. Commissioner, supra; cf. Denver & Rio Grande Western Railroad Co.32 T.C. 43, 56 (1959), affd. 279 F. 2d 368 (C.A. 10, 1960). The adjustment which Clarke made to the accounts receivable control account is not deductible. This adjustment was made to correct the discrepancy between the total amount of the individual accounts receivable and the balance in the accounts receivable control account. No evidence was introduced to show when the error was made; consequently, there is no showing as to the year in which a deduction is properly allowable. Without such evidence, Drew Company has failed to carry its burden of proof. Hart Furniture Co., 12 T.C. 1103 (1949), reversed on another issue by stipulation of the parties 188 F. 2d 968 (C.A. 5, 1950); Albert Nelson, 6 T.C. 764, 772 (1946), acq. 1946-2 C.B. 4. [6]
*251 Issue 6. Abandonment Loss - Building Plans Findings of Fact During its taxable year ending in 1963, Drew Company purchased land on Spring-park Road in Jacksonville for the purpose of erecting a new office building. The Company had some fill dirt placed on the land and plans for the new building prepared. During its taxable year ending in 1967, the Company abandoned its plans to construct a new building, and in 1970 it sold the lot. In its return for 1967 Drew Company claimed a deduction of $27,618.76 as a loss from the abandonment of its building plans. Respondent determined that the loss was allowable only to the extent of $17,532 "because it has not been established that any amount in excess of * * * [that amount] represents a deductible loss." Opinion The burden is upon Drew Company to show that it is entitled to deduct more than the amount allowed by respondent. Rule 32, Tax Court Rules of Practice; Welch v. Helvering, supra. It has not produced any evidence to show either the exact nature of the items it wishes to deduct or the amount of those items. On the basis of this record, we have no alternative but to uphold respondent's determination. Issue *252 7. Computation of Tax - 1963 Findings of Fact During its taxable year ending in 1963, Drew Company sold its land and office building, subject to a mortgage and a lien which had been filed of record by the United States Government, to the Independent Life Insurance Company for approximately $32,000 in cash, retaining the right to occupy the building rent-free for one year. In its return for the taxable year ending in 1963, Drew Company reported a longterm capital gain in the amount of $338,478.59 from this sale; it also reported that its net long-term capital gains exceeded its net short-term capital losses by $336,922.03. The Company's taxable income, exclusive of its capital gains, as revised by respondent, was $257,312.85. Drew Company 155 alleges that it incurred net operating losses which are subject to carryover and carryback to 1963 in the following amounts: Year
Amount
1960
$ 46,378.37
1961
55,564.41
1965
158,488.79
1966
105,178.03
Total
$365,609.60
Less Income:
1962
940.42
Available Net Operating Losses
$364,669.18
Opinion Section 1201(a) [7] provides an alternative tax for corporations which have net longterm capital gains in excess *253 of their net short-term capital losses. The alternative tax consists of (1) a partial tax computed at regular rates on the taxable income exclusive of such excess, and (2) an amount equal to 25 percent of the excess. In computing Drew Company's tax for 1963, respondent applied the 25 percent rate to the full amount of the excess ($337,677.08) [8] without any reduction for the net operating loss carryovers and carrybacks to that year. The amounts of the net operating losses subject to use as 1963 deductions are in dispute in this proceeding and will be calculated in the Rule 50 computation. *254 However, Drew Company asserts in an amendment to its petition that the net operating losses available as deductions for 1963 will be in excess of its taxable income exclusive of capital gains, determined by respondent to be $257,312.85. This excess of net operating losses, it contends, should be used to reduce the amount of the excess of its net long-term capital gains over its net short-term capital losses subject to the 25 percent tax rate. While we might defer consideration of this contention until after the Rule 50 computation has been made, we will not do so in view of the great likelihood that the problem will arise and the substantial effort expended by the parties in briefing the point. Furthermore, we think that a resolution of the point at this time may prove of significant benefit to the parties in making the Rule 50 computation. The contention which the Company now makes has been *255 considered and rejected by this Court twice before, in Chartier Real Estate Co., 52 T.C. 346 (1969), affirmed per curiam 428 F. 2d 474 (C.A. 1, 1970), and in Walter M. Weil, 23 T.C. 424 (1954), affd. 229 F. 2d 593 (C.A. 6, 1956). In those cases, this Court concluded that the statutory language leaves no room for holding that the second part of the alternative tax is to be computed on less than the full amount by which the net long-term capital gain exceeds the net short-term capital loss. The affirming opinions of the Courts of Appeals in no way modified the opinions of this Court. We adhere to the holding of those cases. Issue 8. Additions to Tax for Negligence Findings of Fact and Opinion Respondent has determined that the underpayment of Drew Company's income tax liability for its taxable years ending in 1963, 1964, and 1967 was "due to negligence or intentional disregard of rules and regulations" within the meaning of section 6653 (a). We think that for 1963 the evidence supports respondent's determination. In that year, the Company claimed a deduction for amounts paid to public officials when its officials must have known *256 from a previous audit that such a deduction was not allowable. However, after carefully reviewing the adjustments made to the Company's taxable income for 1964 and 1967, we conclude that the Company's tax computations for those years were not so patently wrong as to warrent a finding that it was negligent or intentionally disregarded the rules and regulations in preparing its returns for those years. Accordingly, the additions to tax under section 6653(a) apply only to Drew Company's taxable year ending in 1963. 156 Issues 9 and 16. Taxability to Hodson and Parke of Miscellaneous Items Findings of Fact For many years Drew Company, in order to obtain business, paid cash or gave merchandise to employees of its customers, including state and county officials. The Company made these kinds of payments at least as early as 1935, and it continued to do so through the taxable years here in controversy. For many years, Hodson and Parke handled the payments on behalf of the Company; the Company issued checks to Hodson or Parke, and they cashed the checks and used the proceeds to make the payments to employees of the Company's customers. Prior to the 1950's, these payments were *257 charged on Drew Company's books to an account entitled "prepaid selling expenses" and were claimed as deductions in its income tax returns. In about 1950, an internal revenue agent, upon examining the returns, disallowed the claimed deductions. After this examination, the Company ceased such payments as current deductions but continued making them. Rather than accruing the payments in an account for "prepaid selling expenses," however, the Company began charging them to the accounts receivable carried in the names of Hodson and Parke and to an account labeled "Pinch Account"; during 1962, this last account was closed to the account receivable in Parke's name. By 1963, the balances in the accounts receivable had become very substantial. In that year, Parke directed that his account receivable be reduced by the sum of $179,075.60, and that amount be charged to "advertising" and claimed as a deduction in computing the Company's 1963 income tax liability. The deduction was disallowed in the notice of deficiency issued to the Company. Although that disallowance was alleged in Drew Company's petition to be erroneous, the adjustment has been conceded on brief. The total amounts the payoffs *258 by Hodson and Parke in relation to the Company's gross sales were as follows: Taxable
Percent
Year
Total
Gross
of Gross
Ending
Payoffs [1]
Sales
Sales
1960
$42,360.84
$1,769,522.11
2.4
1961
55,092.00
1,650,310.78
3.3
1962
27,740.52
1,611,422.15
1.7
1963
38,866.61
1,546,470.30
2.5
1964
23,471.91
1,460,023.68
1.6
a. Additional Amounts Charged to Hodson In addition to the amounts which it is alleged that Hodson paid to Drew Company customers, the account receivable maintained in Hodson's name was debited with the following items: (1) bimonthly salary payments plus applicable social security and withholding tax payments, (2) various personal expenses which the Company paid on his behalf, and (3) travel expense advances referred to in Issue 2, supra. For the years 1959 through 1964, Hodson reported in his returns the following amounts of income from Drew Company: *259 Uniden-
Year
Salary
Bonuses
tified
Total
1959
$15,000.00
$12,500.00
$ 313.25
$ 27,813.25
1960
15,000.00
52.50
15,052.50
1961
15,000.00
5,594.23
1,200.00
21,794.23
1962
15,000.00
8,752.14
1,200.00
24,952.14
1963
15,000.00
6,868.20
1,230.00
23,098.20
1964
15,000.00
1,320.00
16,320.00 The "Salary" and "Bonuses" were credited to his account receivable as were the expenses charged to the Company's travel expense account, but the "Unidentified" amounts were not so credited. For the same period, the debit balances in Hodson's account receivable remaining after the above credits were made and the annual increases therein were as follows: Increase in
Debit
Account
Date
Balance
Receivable
Jan. 1, 1959
$ 33,468.72
Dec. 31, 1959
48,329.56
$14,860.84
Dec. 31, 1960
83,421.69
35,092.13
Dec. 31, 1961
87,162.21
3,740.52
Dec. 31, 1962
91,028.82
3,866.61
Dec. 31, 1963
100,000.73
8,971.91
Dec. 31, 1964
101,375.87
1,375.14
As stated in our Findings with respect to Issue 2, supra, not all of the amounts charged to the travel expense account for trips made by Hodson in the Company's behalf *260 were completely documented. He also failed to substantiate that certain amounts traced to him through the Company's miscellaneous expense account were expended for the Company's benefit. The amounts charged to the travel expense and miscellaneous expense accounts which are traceable to Hodson are as follows: Travel
Miscellaneous
Year
Expense [1]
Expense
1959
$ 420.62
1960
$ 300.00
1,112.64
1961
$11,728.65
$827.78
1962
6,385.56
967.21
1963
1,905.57
842.51 157 Respondent determined that the yearly increases in Hodson's account receivable and the foregoing amounts in the travel expense and miscellaneous expense accounts comprise distributions from Drew Company, taxable as provided by sections 301 and 316, i.e., as ordinary income to the extent of Drew Compan'S *261 EARNINGS AND PROFITS ACCUMULATED SINCE 1913, ANY EXCESS BEING TREATED AS A RETURN OF CAPITAL TO THE EXTENT OF Hodson's basis in the stock of $43,125, the remainder being taxed at capital gains rates. [9] The amounts so treated were as follows: Increase in
Account
Travel
Miscellaneous
Year
Receivable
Expense
Expense
Total
1959
$14,860.84
$ 420.62
$15,281.46
1960
35,092.13
$ 300.00
1,112.64
36,504.77
1961
3,740.52
11,728.65
827.78
16,296.95
1962
3,866.61
6,385.56
967.21
11,219.38
1963
8,971.91
1,905.57
842.51
11,719.99
1964
2,155.00
2,155.00
The parties are not in dispute as to the amounts of the ac
The parties are not in dispute as to the amounts of the accumulated earnings and profits of the Company ($147,527.88 as of July 1, 1959) except insofar as such amounts are affected by the issues placed in dispute by the Company in the present proceeding. Ultimate Findings of Fact Hodson received additional income from Drew Company, taxable under section 301, during *262 the years in issue as follows: Year
Dividend Income
1959
[1] $ 420.62
1960
[1] 1,112.64
1961
827.78
1962
967.21
1963
842.51
1964
0 b. Additional Amounts Charged to Parke Parke began to work for Drew Company as an office boy in 1925. He gradually worked his way up in the Company, serving successively as a salesman and the credit manager, and, finally, in 1955 or 1956 he attained the position of treasurer. He held this last position through 1967, except for a brief period during 1963. Parke was also a member of the board of directors, but he owned no stock in the Company. Although he held the title of Company treasurer, Parke's services were primarily related to securing business; he spent approximately 80 percent of his time on the road for that purpose. In the course of these activities, he made the payments referred to above to public officials and other employees of Company customers. Such payments were charged to the account receivable maintained in his name or to the Pinch Account. The Pinch Account had debit balances between January 1, 1958, and *263 August 31, 1962, when it was closed to the account receivable in Parke's name, as follows: Debit
Increase
Date
Balance
During Year
Jan. 1, 1958
$ 3,748.00
Dec. 31, 1958
33,020.63
$29,272.63
Dec. 31, 1959
65,396.48
32,375.85
Dec. 31, 1960
91,844.48
26,448.00
Dec. 31, 1961
115,830.48
23,986.00
Aug. 31, 1962
119,375.45
3,544.97 The account receivable in Parke's name showed the following debit balances between January 1, 1958, and December 31, 1963: Increase
Debit
(Decrease)
Date
Balance
During Year
Jan. 1, 1958
$ 38,028.20
Dec. 31, 1958
38,647.95
$ 619.75
Dec. 31, 1959
34,157.67
(4,490.28)
Dec. 31, 1960
$ 37,315.47
$ 3,157.80
Dec. 31, 1961
42,143.14
4,827.67
Dec. 31, 1962
201,513.88
[1] 39,995.29
Dec. 31, 1963
[2] 216,022.43
14,508.55
Drew Company claimed deductions for travel expense incurred by Parke and for miscellaneous expense incurred in his behalf as follows: *264 Travel
Miscellaneous
Year
Expense
Expense
1959
$ 268.00
1960
$ 757.48
131.34
1961
23.92
4,062.11
Travel
Miscellaneous
Year
Expense
Expense
1962
$1,400.46
$2,629.57
1963
4,154.48
In his returns for the years 1958 through 1963, Parke reported as income received from Drew Company the following amounts: Year
Reported Income
1958
$ 17,884.70
1959
20,000.04
1960
10,384.62
1961
12,000.00
1962
13,764.62
1963
26,594.62
Respondent determined that Parke received additional income during those years equal to the total yearly increases in his account receivable and the Pinch Account, plus the travel and miscellaneous expenses paid by the Company in his behalf, as follows: Accounts
Travel
Miscellaneous
Year
Receivable
Expense
Expense
Total
1958
$29,892.38
$29,892.38
1959
27,885.57
$ 268.00
28,153.57
1960
29,605.80
$ 757.48
131.34
30,494.62
1961
28,813.67
23.92
4,062.11
32,899.70
1962
43,540.26
1,400.46
2,629.57
47,570.29
1963
14,508.55
4,154.48
18,663.03
Ultimate Findings of Fact Parke received additional compensation during the *265 years in issue as follows: Additional
Year
Compensation
1958
[1] $ 892.38
1959
[1] 653.57
1960
9,737.14
1961
8,875.78
1962
11,169.83
1963
4,163.03 Opinion This issue as to whether Hodson and Parke realized taxable income through the conversion of Drew Company funds to their own use must be viewed in its context. Drew Company had for a number of years disbursed money to its officers so that they could make payments to employees of its customers. These payments were made for the purpose of securing business, and for 1963 the Company claimed a deduction for such payments made over a number of prior years, in the total amount of $179,075.60, as an advertising expense. The Company has now conceded that it is not entitled to such a deduction. See sec. 162(c)(1). Respondent makes no argument that officials of the Company did not, in fact, pay bribes or other gratuities to public officials as well as the employees of private business establishments. Indeed, in connection with the *266 issue as it relates to the Company, he requests that we judicially notice that "Offering a cash payment to a public official in order to obtain business from a governmental agency or instrumentality is in violation of public policy" and that, therefore, no deduction is allowable for such expenditures. His argument, as it relates to Hodson and Parke, is that the trial record does not establish that they did not keep all, or at least a substantial part, of these moneys. [10] 159 The law is quite clear that an employee does not realize taxable income when he serves merely as a conduit for the transmission of funds *267 to another on behalf of his employer. See, e.g., Willard S. Heminway, 44 T.C. 96 (1965); Horace Mill, 5 T.C. 691 (1945), acq. 1945 C.B. 5. On the other hand, to the extent that the employee does not expend on behalf of his employer funds with which he has been entrusted, they are a part of his income. See, e.g., Walter I. Geer, 28 T.C. 994, 997 (1957); James T. Thrower, 21 T.C.M. 1540, 1548, T.C. Memo. 1962-291, affirmed per curiam 330 F. 2d 614 (C.A. 5, 1964). Thus, the issue is factual: What part, if any, of the moneys turned over by the Company to Hodson and Parke was kept by them, and what part, if any, was passed on to employees of the Company's customers? Hodson is dead, and we did not have the benefit of his testimony. Parke, however, testified at length on the circumstances in which these payments were made, and he steadfactly maintained that all the disputed amounts were disbursed by him and Hodson. Although he was cross-examined extensively, his testimony was not substantially impeached. Furthermore, it is corroborated by a number of other circumstances. We find Parke's testimony basically credible. *268 The testimony shows that the purchasing agent of Duval County was prosecuted for taking bribes from Drew Company, among others, amounting to 20 percent of the purchases for which he was responsible. Parke named several other individuals to whom similar payments were made. Parke owned no stock in the Drew Company, and no reason has been suggested why the stockholders would condone his withdrawing large sums of money from the Company for his own benefit. On the other hand, the stockholders' passivity would be readily understandable if the funds were indeed paid to the Company's customers. Furthermore, over 75 percent of the Company's stock was held in trust, and Hodson would have violated that trust if he had misappropriated the Company's funds or allowed anyone else to do so. And we note that the annual increases in Hodson's account declined as his active participation in the business decreased. There is no evidence that either Parke or Hodson had accumulated substantial amounts of money or that they lived lavishly. Indeed, Hodson mortgaged his St. John County homestead for $25,000 to make the down payment on the Liberty Street warehouse in 1965 and lost that building as a result *269 of the foreclosure of the mortgage only about a year later. See Issue 11, infra. While the total amounts of the claimed yearly payoffs to public officials were substantial, the Company's gross sales were also quite large, amounting to approximately $1,800,000 in 1960. As noted in our Findings, the claimed payoffs averaged about 2.3 percent of sales. Yet the payments to the Duval County public official who was prosecuted for receiving such payments came to 20 percent of the purchases which he handled. On the other hand, Parke admitted that part of the increases in his account receivable was due to withdrawals of funds for his benefit in excess of his salary. While he contends that this amount was limited to $31,351.28, possibly withdrawn in whole or in part before the years in issue, we are not so convinced. The account receivable in Parke's name is disorganized and was poorly kept. It is impossible from a review of that account to determine how Parke ascertained the amount which he "owed" the Company. This factor gains added significance from the fact that Parke, as Company treasurer, was responsible for seeing that the Company records were adequately maintained. That the debit *270 balances represented a debt owed to the Company is also problematical. Parke did, indeed, testify that he owed that amount; however, he expressed no intent to repay it, nor did he indicate the existence of any such plan, and it was not evidenced by any notes or secured by any collateral. Applying Cohan v. Commissioner, supra, in the light of all the evidence we have stated in our Findings the amounts of the funds which, we conclude, Hodson and Parke transmitted to the Company's customers. Turning next to the travel expenses determined to constitute additional income to Hodson and Parke, we note that this is basically the same question dealt with in Issue 2, supra. We there held that the amounts claimed as travel expense deductions by Drew Company for trips taken by Hodson and Parke in its behalf during 1960 through 1962 were deductible by the Company. Consistent with that conclusion, we now hold that the amounts expended by the Company during that period do not 160 constitute additional income to either Hodson or Parke. While Drew Company in Issue 2, supra, conceded that under section 274, the costs of the trips taken by Hodson during 1963 were not deductible, *271 that concession does not necessarily mean that such amounts constitute additional income to Hodson. That section 274 precludes Drew Company from claiming the expenses as a deduction does not, in itself, cause such expenses to be included in Hodson's income. The general explanation of section 274 in H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 423-424, states that "The only purpose of this section is to disallow deductions in certain cases and therefore this bill does not affect the question of the includibility or excludability of an item in income of any individual." See also S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 733; Nicholls, North, Buse Co., 56 T.C. 1225, 1238-1239 (1971); John L. Ashby, 50 T.C. 409, 418 (1968). The disputed 1963 travel expenses are the same kinds of expenses as those which we have held the Company may deduct in its taxable years ending in 1960 through 1963 (prior to December 31, 1962). All of these 1963 expenses were recorded on the books and records of Drew Company by its bookkeeper as they were incurred during the regular course of business. Consistent with our treatment *272 of the expenses incurred prior to December 31, 1962, we hold that the 1963 expenses do not constitute additional compensation to Hodson. Finally, we consider the miscellaneous expenses incurred by Drew Company on behalf of Hodson and Parke. No evidence has been presented as to these items either by Drew Company or by Hodson and Parke. Subject to the applicability of the statute of limitations prescribed by section 6501(e)(1) (see Issues 14 and 17, infra), we hold that these amounts constitute additional income to them. Issue 10. Commission Expenses Findings of Fact By the end of 1962, Hodson had, in addition to his duties for Drew Company, assumed a position as a commission salesman for Automatic Voting Machine Corporation. His territory covered the States of Florida, Georgia, Alabama and Mississippi, and he was required to travel extensively throughout that area. During the period from 1964 through 1966, Hodson claimed deductions for the cost of such trips, which were disallowed by respondent as follows: Miles
Deduction
Amount
Year
Traveled
Claimed
Disallowed
1964
43,942
$4,394.20
$1,168.26
1965
39,918
3,991.80
747.34
1966
36,418
3,641.80
642.54
*273 During 1964, Hodson paid $1,000 to George D. Stewart, an attorney in Georgia, for advice in relation to Georgia voting laws. A claimed deduction for this amount in Hodson's 1964 return was disallowed by respondent. Opinion The deduction claimed in Hodson's returns for 1964 through 1966 for Automatic Voting Machine Corporation travel was based on estimated expenses computed at the rate of 10 cents per mile. Respondent in Rev. Proc. 66-10, 1966-1 C.B. 622, announced that costs of travel may be estimated at the rate of 10 cents per mile only for the first 15,000 miles, and that a rate of only 7 cents per mile may be used for any additional miles traveled. Employing this formula, respondent disallowed a portion of the claimed travel expenses. On brief, respondent has conceded that his computation for 1964 was erroneous to the extent of $300, and that Hodson is entitled to an additional deduction for that year in that amount. Since no concrete evidence has been presented to show any other errors in respondent's determination, the determination is otherwise sustained. As to the attorney's fees, Hodson's son testified that Hodson consulted with George D. Stewart for *274 advice with respect to the effect of the Georgia election laws on the use of automatic voting machines. He needed this advice in connection with his business. We find this uncontradicted testimony to be credible, and we hold that the $1,000 paid to George D. Stewart in 1964 is deductible as an expense of Hodson's business. Issue 11. Liberty Street Property Findings of Fact On or about May 25, 1965, Hodson purchased a building at 2137 Liberty Street, Jacksonville, Florida. He paid $25,448.85 in cash, assumed an existing first mortgage to Prudential Insurance Company of America (hereinafter Prudential), and gave a second mortgage to the sellers, George D. Auchter, 161 Jr., and Julia B. Auchter (hereinafter referred to as the Auchters). The total purchase price was $200,779.37, inccoding reocrding fees and related expenses. On December 6, 1965, Hodson paid $2,500 to Prudential as a payment on the first mortgage; of this amount, $1,400 represented interest, and $1,100 constituted a payment on the principal amount of the mortgage note. At the time Hodson acquired this building, he anticipated that Drew Company would occupy it and pay rent. He also anticipated that the Company *275 would, when it had sufficient funds, buy the building for use in its business. The Company, however, finding itself unable to raise sufficient funds to finance its move into the new building, neither rented nor purchased it from Hodson. Since he was unable to make the mortgage payments, Hodson defaulted in his payments. On April 18, 1966, the Auchters foreclosed the second mortgage. In his 1965 return, Hodson claimed a deduction for interest expense in the amount of $7,274.96; included in this amount was the $2,500 payment to Prudential on December 6, 1965. In his 1966 return, Hodson claimed a deduction of $28,300 which was described as a worthless "Note Receivable H. & W B Drew Co., Inc." Respondent determined that no part of the $2,500 constituted deductible interest for 1965, and that no bad debt deduction was allowable for 1966. Opinion On brief, the parties agree that Hodson purchased and owned the building, and that the amounts which he invested in it did not constitute loan to Drew Company. They also agree that the foreclosure action constituted a sale or exchange of the property. Helvering v. Hammel, 311 U.S. 504 (1941). The only points on which they do *276 not agree are: (1) whether the loss incurred in the foreclosure action is deductible under section 165, [11] or instead, constitutes a nondeductible personal loss; and (2) if the loss is deductible, whether Hodson is entitled to the benefits of section 1231. [1]2 *277 Respondent contends that Hodson bought the building merely as an accommodation of Drew Company and expected immediately to resell it to the Company. Consequently, respondent argues, the loss was not incurred in a transaction entered into for profit or in a trade or business within the meaning of section 165. At best, respondent argues, any loss which Hodson may have suffered was a capital loss because the building was never used in any trade or business in which he was engaged within the meaning of section 1231. A careful review of the facts demonstrates the error of respondent's position. Hodson purchased the building and retained title to it. That he did not expect the building to remain unoccupied or to be used by Drew Company rent-free is obvious. As subsequent events so eloquently demonstrate, Hodson could not have afforded to keep the building without deriving some income from it. Indeed, because he realized no income from this building, within a year of the purchase he had defaulted on the mortgage, and foreclosure proceedings had been instituted. We think it also apparent that Hodson did not expect to sell the building to Drew Company immediately. In view of his financial *278 interest in the Company, he was undoubtedly aware of its unsound financial condition. The Company's lack of funds and borrowing power rendered it unable to obtain sufficient funds to pay the cost 162 of a move into the new building, let alone purchase it. Indeed, Hodson purchased the building only after the Company had failed in its attempts to raise funds with which to make the purchase. In view of these facts we can only conclude that Hodson purchased the building with a view to renting it to Drew Company, and this Court has held that the renting of even a single building constitutes a business. Anders I. Lagreide, 23 T.C. 508, 512 (1954); Leland Hazard, 7 T.C. 372 (1946), acq. 1946-2 C.B. 3. The loss suffered by Hodson was not, therefore, as respondent argues, the result of a mere personal investment which he made to accommodate his sons, who were officers of the Company. The loss was incurred "in a trade or business," and is deductible under section 165(c). As to the character of the loss, it is clear that if the building had actually been rented to Drew Company, or anyone else, the loss would have been incurred from the sale or exchange *279 of property used in Hodson's trade or business, and he would be entitled to section 1231 treatment. E.G., Anders I. Lagreide, supra; Nelson A. Farry, 13 T.C. 8, 13-14 (1949), acq. 1950-1 C.B. 2. That this business use of the building was frustrated by events beyond Hodson's control - the failure of Drew Company to secure adequate financing to enable it to move its equipment - is not a sufficient reason to deny him the benefit of that section. The building was purchased for use in a trade or business, and that is what is required in order to constitute an asset "used in the trade or business" within the meaning of section 1231. Alamo Broadcasting Co., 15 T.C. 534, 541 (1950), acq. 1951-1 C.B. 1; Carter-Colton Cigar Co., 9 T.C. 219 (1947), acq. 1947-2 C.B. 1. The amount which Hodson is entitled to deduct in his return for 1966 is the difference between the amount realized on the sale and his basis in the property. The amount which he realized consists of the sum of the principal amount of the debt secured by the first mortgage at the time of the sale and the amount of the debt secured by the *280 second mortgage canceled by the foreclosure. His basis in the property was $200,779.37 less any depreciation allowable prior to the sale. Sec. 1016(a) (2); Crane v. Commissioner, 331 U.S. 1 (1947). Hodson is also entitled to a deduction for the interest paid to Prudential during 1965 in the amount of $1,400. Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). Issue 12. Freeze Losses Findings of Fact During 1962 the area in the vicinity of Jacksonville, Florida, suffered a freeze of sufficient severity to cause damage to citrus trees. Hodson owned two citrus groves, one in St. Johns County, occupying 14 acres, and another in Marion County, occupying 12 acres. The St. Johns County grove was 85 percent destroyed and the Marion County grove was completely destroyed by the freeze. The St. Johns County grove was a part of a larger, approximately 26-acre tract of land, on which was also located Hodson's residence. The property had about 400 feet of river frontage and extended about 2,760 feet from the road. In addition to the main residence, there were two smaller dwellings, a barn, a workshop, and a swimming pool located on the land. Hodson purchased this *281 property on June 25, 1957, for $60,147.55, including recording fees and related expenses. During 1958, the grove on this property was damaged by a freeze to the extent of $15,000, and this amount was deducted in Hodson's return for that year. The Marion County grove was located on an 80-acre tract of land which Hodson purchased on January 9, 1946, for $11,000. In December 1957, this grove was damaged by a freeze to the extent of $17,500, and this amount was deducted in Hodson's return for that year. In his return for 1962, Hodson claimed loss deductions for the damage done to his citrus groves to the extent of $17,000 for the St. Johns County grove and $12,500 for the Marion County grove. Respondent determined that no part of this claimed loss was allowable "because it has not been established that any deductible loss was sustained during the taxable year." Opinion Section 165(a) allows a deduction for any loss sustained during the taxable year, but the deduction is limited by section 165 (c), in the case of individuals, to casualty losses and those losses incurred in a trade or business or in a transaction entered into 163 for profit. The allowable loss may not exceed *282 the adjusted basis of the property. Sec. 165(b). Both parties agree that the freeze losses here in dispute were incurred in a trade or business carried on by Hodson. The only controversy is whether petitioners have established the amounts of the losses. With respect to the St. Johns County property, the evidence establishes a total cost basis of $60,147.55. Our first task is to allocate this basis as of June 25, 1957, the date of acquisition, between the grove and the land and buildings. Respondent offered expert testimony which tends to show that in 1965 the value of the land alone, due largely to its favorable location along the river, was about 65 percent of the total value of the property and the buildings were worth about 17 percent of such value. This evidence is not entitled to great weight, however, because of the time span between the date of the purchase and the date of the appraisal, and because of the appraiser's admitted unfamiliarity with valuing citrus groves. Using our best judgment on the basis of the record before us, we find that the cost allocable to the citrus grove is $18,000, of which $15,000 was deducted as a loss in 1958. Of the remaining $3,000 cost *283 basis, 85 percent was lost in 1962 so that Hodson is entitled to deduct $2,550 for that year. Cohan v. Commissioner, supra. The Marion County property presents a different situation. One element of Hodson's case is, of course, to establish his adjusted basis in the grove, I. Hal Millsap, Jr., 46 T.C. 751, 758-761 (1966), affd. 387 F. 2d 420 (C.A. 8, 1968). The only evidence of Hodson's basis for this property shows that he paid $11,000 for the 80 acres; there is no evidence of record to substantiate his claimed cost basis of $35,000. Since the deduction claimed and allowed for the 1957 freeze loss ($17,500) exceeds the total established cost basis for the grove, no deduction is allowable for 1962. Issue 13. Hurricane Loss Findings of Fact In September 1964, Hurricane Dora struck the Jacksonville area, partially destroying a dock extending about 500 feet into the river from Hodson's St. Johns County property. The dock was made of creosoted pilings and cross members. It was about 6 1/2 feet wide and opened into an "L"-shaped platform at its river end. The dock has not been restored. In his return for 1964, Hodson claimed a casualty *284 loss in the amount of $4,900 - $5,000 loss less the $100 reduction prescribed by section 165(c)(3). Respondent disallowed the claimed loss in its entirety. Opinion It is clear that a dock, partially completed when Hodson purchased the property and later finished, was damaged by Hurricane Dora. Unfortunately, the record is barren of any evidence tending to show either the measure of the damages or Hodson's basis in the dock. I. Hal Millsap, Jr., supra. Respondent's determination is sustained. Issue 14. Statute of Limitations Findings of Fact and Opinion Respondent obtained waivers of the statute of limitations pursuant to section 6501(c) (4) [13] for Hodson's 1959 and 1960 taxable years more than three but less than six years after the returns for those years had been filed. Those waivers are effective only if the 6-year statute of limitations 164 prescribed by section 6501(e)(1) is applicable. That section applies only if Hodson omitted "from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return." *285 The only adjustments to Hodson's gross income for 1959 and 1960 are those considered in Issue 9, supra. We have concluded in our discussion of that issue that only the a7ounts claimed as deductions for miscellaneous expenses by Drew Company which are attributable to Hodson ($420.62 in 1959 and $1,112.64 in 1960) constitute additional income to him during 1959 and 1960. These amounts are considerably less than 25 percent of the gross income stated in Hodson's returns for the respective years ($32,111.54 for 1959 and $19,581.86 for 1960). Consequently, the waiver was not timely executed. Under these circumstances, no deficiency may be assessed for 1959 and 1960. Issue 15. Dividend Income - Horace Drew (docket No. 4134-69) Findings of Fact During 1962 and 1963, Horace was employed by Drew Company as a traveling sales representative. He was primarily engaged in soliciting sales from private enterprises, but he also solicited business from the University of Florida and the Florida State Turnpike Authority. For his services, Horace received a salary of $12,000 in 1962 and $13,275 in 1963. In addition, he was given a travel expense allowance of $25 per month. Horace owned no stock *286 in Drew Company during this period. As in the case of other Company employees, an account receivable was maintained in the name of Horace on the books and records of Drew Company. This account was debited for amounts paid to or for the benefit of Horace, and credited for his salary and for amounts paid to him by the Company as reimbursements of expenses which he incurred in its behalf (see Issue 2, supra). The account had debit balances during the years in issue as follows: Date
Amount
Jan. 1, 1962
$4,863.54
Dec. 31, 1962
7,911.82
Dec. 31, 1963
39.82 On June 30, 1963, this account was credited with the amount of $9,525.76; of this amount, $6,152.68 represented reimbursement for travel expenses for which Horace had not previously submitted adequate substantiation; $1,902.85 represented additional compensation received prior to June 30, 1961, and $1,470.23 represented additional compensation received on August 31, 1962. Drew Company either directly paid travel expenses incurred by Horace or reimbursed him for such expenses, i.e., credited his account payable, and charged such payments to its travel expense account during 1962 and 1963 in the amounts of $1,312.11 *287 and $9,962, respectively. A further amount of $158.03 paid by Drew Company was charged to the Company's miscellaneous expense account during 1963. Respondent determined that the "advances made to * * * [Horace] or for * * * [his] benefit by The H. & W. B. Drew Company during 1962 and 1963 comprise in part dividend income under sections 301 and 316 of the Internal Revenue Code which is includible in * * * [his] gross income and comprise in part return of capital." Respondent computed the additional income as follows: 1962
1963
Increase (decrease) in your account receivable
$3,048.28
[7,872.00)
Travel expense charges
1,312.11
9,962.00
Miscellaneous and office expense charges
165.03
Total
n1 $4,360.39
$ 2,248.03
Less: Return of capi- tal
1,712.14
Dividends received
n1 $2,648.25
$ 2,248.03
Less: Dividend exclu- sion
50.00
50.00
Taxable dividend income
n1 $2,598.25
$ 2,198.03
Opinion On brief respondent concedes that, since Horace owned no stock in Drew Company during 1962 and 1963, he did not receive any amounts during those years as dividend income. *288 However, respondent contends that the amounts erroneously determined to have been dividend distributions were in reality additional compensation to Horace. We consider first the increases in Horace's account receivable. These increases were attributable primarily to travel advances charged to the account receivable and not transferred to the travel expense 165 account because the amounts of the actual travel expenses were not adequately substantiated. The testimony shows that the advanced travel funds were actually spent on travel to solicit business for the Company, and we find this testimony to be basically credible. An examination of the account receivable, however, indicates that the increases in the debit balances of that account were not caused exclusively by travel advances. Starting with a credit balance of $3,166.28 on July 1, 1960, debit entries totaling $5,069.13 were made to the account for items other than travel advances during the ensuing 12 months. These debits were identified variously as "Draw A/C," "A/C - Sal Advance," "Gator Football Boosters," "Comm. A/C," "Pittsburgh Plate Glass," and "Rosenblum's." All of these entries were with respect to items over *289 and above the amounts regularly drawn as salary, and the parties agree that none of the entries caused Horace to owe the Company any money. After carefully reviewing the record, we conclude that these advances to Horace during the Company's taxable year ending in 1961 constitute additional compensation to him to the extent of $1,902.85 ($5,069.13 - $3,166.28). However, neither Horace's 1960 nor his 1961 taxable year is before us in these proceedings and we can find no deficiencies for those years. A similar review of the account receivable for the period from July 1, 1961, through June 30, 1963, discloses only one entry which reflects additional compensation. That entry, dated August 31, 1962, is designated "A/C Rec" and is in the amount of $1,470.23. Since this payment by the Company to or for the benefit of Horace did not create a debt owing to the Company, we can only conclude that it represents additional compensation to him and is taxable to him during 1962. We now consider the amounts charged to the Company's travel expense account during 1962 and 1963. We have previously concluded that the amounts recorded in Drew Company's travel expense account during 1962 were in fact *290 travel expenses incurred for the benefit of the Company and have concluded that they are allowable as deductions. See Issue 2, supra. That conclusion disposes of respondent's contention that Horace's travel expenditures constitute additional income to him during 1962. The 1963 travel expense charge, however, is somewhat different. To the extent that it represents trips made by Hodson on behalf of Drew Company, it too is deductible by the Company and does not constitute income to Horace. However, as stated above, we are of the opinion that the $9,525.76 charge represents accumulated travel expenses only to the extent of $6,152.68 and that the $3,373.08 difference represents additional compensation to Horace. This additional compensation, however, is taxable to Horace for the years in which he withdrew the money: $1,902.85 in 1960 and 1961, and $1,470.23 during 1962. [14] Thus, none of the $9,525.76 charged to the Company's travel expense account during 1963 constituted additional income to Horace for that year. *291 We now turn to the miscellaneous expense item. No evidence whatever was produced as to the nature of this item except that it was claimed as a deduction by Drew Company. Whether these expenditures are to be held to constitute additional income to Horace depends on which party has the burden of proof. In the notice of deficiency, as noted above, respondent determined that Horace had received dividend income in a designated amount. As to that issue Horace clearly had the burden of proof, and he carried that burden by establishing that he was not a stockholder of Drew Company at the time he allegedly received the dividends. Respondent thereupon abandoned the grounds on which his original determination was based, Leon Papineau, 28 T.C. 54, 57 (1957), and set out to establish that Horace received the same amount of income as a result of an entirely different relationship - that of being an employee. The only similarity between the two theories is that the amount of income alleged to have been received is the same. The two theories are mutually exclusive; if Horace received the funds as dividends he did not receive them as compensation for services, and vice versa. Different *292 kinds of evidence are required to refute each theory. [15] We think the compensation theory, 166 therefore, constitutes a new issue not raised by the notice of deficiency and that respondent has the burden of proving that Horace received additional compensation during 1963. [16]Rozelle McSpadden, 50 T.C. 478, 493 (1968); Sheldon Tauber, 24 T.C. 179 (1955), acq. 1955-2 C.B. 9. We find that respondent has failed to carry his burden. Issue *293 16. Additional Compensation - Parke (Docket No. 4155-69) See Issue 9, supra, where this issue is discussed. Issue 17. Statute of Limitations Findings of Fact and Opinion Respondent obtained waivers of the statute of limitations pursuant to section 6501(c)(4) for Parke's 1958, 1959, and 1960 taxable years more than three but less than six years after the returns for those years were filed. For those waivers to be effective to extend the statute of limitations, they must have been executed during the period when an additional tax liability could have been assessed, i.e., within the 6-year period prescribed by section 6501(e). That section is applicable only if Parke omitted from his gross income an amount in excess of 25 percent of the amount of gross income stated in his return, and respondent has the burden of establishing that this condition has been met. Elsie SoRelle, 22 T.C. 459, 486 (1954), acq. 1955-1 C.B. 6; C.A. Reis, 1 T.C. 9, 12-13 (1942). In our discussion of Issues 9 and 16, supra, we have made Findings as to the amounts of gross income omitted from Parke's returns for 1958, 1959, and 1960. Such omission did not exceed *294 25 percent of the gross income stated in his returns for 1958 and 1959. This is not true, however, with regard to 1960. Our Findings were that Parke understated his gross income for 1960 by $9,737.14 (consisting of the $9,605.80 increase in his account receivable and $131.34 in miscellaneous expenses paid by Drew Company for Parke's benefit) whereas the gross income stated in his return for that year was only $10,844.83. Respondent established that Drew Company disbursed large sums of money to Parke during 1960 and recorded the disbursements in the Pinch Account and an account receivable maintained in Parke's name. Included in the amounts so recorded were Parke's salary and other compensation as well as the amounts which he claims that he paid over to public officials. The entries in these accounts, maintained under his general supervision, are not sufficiently informative to indicate the purposes for which the funds were used. We think respondent's evidence was enough to shift to Parke the burden of going forward with evidence that the amounts which he claims were disbursed to public officials were so expended. To some extent he did this. However, upon consideration of the entire *295 record, we think that respondent has proven that Parke retained amounts disbursed to him by Drew Company, in addition to his salary and other reported compensation, in excess of 25 percent of the amount of gross income stated in his return for 1960. The waiver obtained for 1960 was timely, and a deficiency may be assessed for that year. Issue 18. Additions to Tax Findings of Fact and Opinion Respondent determined that a portion of the underpayment of taxes for Parke's 1958 through 1963 taxable years was "due to negligence or intentional disregard of rules and regulations" within the meaning of section 6653(a), and that the 5 percent penalty provided for in that section is applicable. After carefully reviewing the facts, we conclude that Parke was either negligent or intentionally disregarded the rules and regulations in computing his tax liability for 1960 through 1963; as discussed in Issue 17, supra, the years 1958 and 1959 are barred by limitations. On this issue, Parke had the burden of proving that in filing his returns he exercised due care and did not fail "to do what a reasonable and ordinarily prudent person would do under the circumstances." Marcello v. Commissioner, 380 F. 2d 499, 506 *296 (C.A. 5, 1967), affirming on this issue a Memorandum Opinion of 167 this Court. In our discussion of Issues 9 and 16, supra, we have concluded that Parke failed to report substantial amounts of income which he received from Drew Company. While he contends that he was merely a conduit of these funds, he offered no testimony to explain his failure to keep any personal records of their disposition. In order to arrive at what we believe to be a reasonable segregation of the taxable from the nontaxable amounts, we have been required to apply the Cohan rule. Since he knew that large sums were being charged to him on the Drew Company books, we think a reasonable and ordinarily prudent person would have maintained records which could have been used to verify his income tax returns. We hold that Parke has not carried his burden of showing that his underpayments for 1960 through 1963 were not due to negligence or intentional disregard of the rules and regulations. Consistent with the foregoing, Decisions will be entered under Rule 50. Footnotes
1. The proceedings of the following petitioners are consolidated herewith: The H. & W.B. Drew Company, docket No. 4154-69; Charles Fleming Parke and Regina W. Parke, docket No. 4155-69; and Estate of E. Hodson Drew, Deceased, Edward deBelle Drew and Sherwood Drew Robinson, as Administrators, and Jessie deBelle Drew, Surviving Wife, docket No. 4156-69.↩
2. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.↩
3. For simplicity, Drew Company's taxable years will hereinafter sometimes be referred to by reference only to the year in which they end.↩
4. These amounts include those items disallowed in the notice of deficiency but subsequently determined to be allowable by respondent.↩
5. While it is not the basis for our decision, we note that if these items were not traveling expenses they would constitute additional compensation to the salesmen and as such would be deductible by Drew Company.↩
1. $180 of this amount accrued prior to January 1, 1963.↩
1. The differences between the amounts of the additions to the account and the amounts deducted represent recoveries on debts charged off in prior years.↩
6. Respondent is, of course, correct in his determination that the write-off of credit balances in the account receivable ledger cards, which balances evidently represent payments received in advance of furnishing merchandise, does not constitute income taxable in 1965. Such amounts were taxable to Drew Company at the time they were received and became subject to its unrestricted use. See, e. g., Chester Farrara, 44 T.C. 189↩ (1965).
7. SEC. 1201. ALTERNATIVE TAX. (a) Corporations. - If for any taxable year the net long-term capital gain of any corporation exceeds the net short-term capital loss, then, in lieu of the tax imposed by sections 11, 511, 821(a) or (c), and 831(a), there is hereby imposed a tax (if such tax is less than the tax imposed by such sections) which shall consist of the sum of - (1) a partial tax computed on the taxable income reduced by the amount of such excess, at the rates and in the manner as if this subsection had not been enacted, and (2) an amount equal to 25 percent of such excess, * * *.↩
8. This amount ($337,677.08) is the excess of the long-term capital gain over the net short-term capital loss reported by Drew Company ($336,922.03) as adjusted by respondent to disallow the claimed loss from the Selva Marina Country Club stock ($755.05) referred to in Issue 4, supra.↩
1. These payoffs were made during the first half of the indicated taxable year of the Company and the last half of its preceding taxable year, i, e., the payoffs shown for the Company's taxable year ending June 30, 1960, were actually made during the calendar year 1959.↩
1. Of these travel expenses, $11,118.15 in 1961 and $5,806.15 in 1962 represent amounts originally debited to Hodson's account receivable and then removed by year-end entries to the Company's travel expense account at the direction of Hodson or Parke; the remainder of these expenses was charged to the Company's travel expense account as they were incurred. See Issue 2, supra.↩
9. The amounts subject to such treatments in each category will be affected by the redeterminations made herein of Drew Company's taxable income.↩
1. Assessments for these years are barred by the statute of limitations. See Issue 14, infra.↩
1. This increase is exclusive of the $119,375.45 posted to this account upon the closing of the Pinch Account. ↩
2. This balance includes the $179,075.60 charged to advertising and promotion expense on June 30, 1963.↩
1. Assessments of deficiencies for these years are barred by the statute of limitations. See Issue 17, infra.↩
10. The assessment of deficiencies againsthodson for 1959 and 1960, and Parke for 1958, 1959, and 1960, is barred by the statute of limitations, unless sec. 6501(e)(1) is applicable. To avoid the bar of limitations, respondent has the burden of proving for each of the years an omission from gross income of an amount properly includable therein which is in excess of 25 percent of the amount of the gross income stated in the return. In the discussion of Issues 14 and 17, infra, we hold that he has failed to do so for each of these years, except for 1960 in Parke's case.↩
11. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. -in the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and * * * Respondent apparently made an error of $7 in totaling these amounts.
[1]2 SEC. 1231. PROPERTY USED IN THE TRADE OF BUSINESS AND INVOLUNTARY CONVERSIONS. (a) General Rule. - If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * * * * *↩
13. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. - Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * (c) Exceptions. - * * * (4) Extension by Agreement. - Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title, * * * both the Secretary or his delegate and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. * * * (e) Substantial Omission of Items. - Except as otherwise provided in subsection (c) - (1) Income taxes. - In the case of any tax imposed by subtitle A - (A) General Rule. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. * * *↩
14. This item of income was previously considered as an increase in the debit balance in the account receivable in Horace's name and was there held to constitute income to Horace for 1962.↩
15. Horace might, for example, show that he was fully compensated for his services and that any additional payments to him were in reality dividends to his father, Hodson, and gifts to him. ↩
16. We note that the burden of proof as to whether these miscellaneous expenses constitute additional compensation is on respondent only as to Horace. The burden is still on Drew Company to establish that they are deductible expenses because the deficiency notice issued to Drew Company determined they did not "constitute ordinary and necessary business expenses." However, such miscellaneous expenses would be deductible by Drew Company under either theory - as miscellaneous expenses or as additional compensation.↩